**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LIBERTY INSURANCE UNDERWRITERS, INC., a New York Corporation | ) | FILED: APRIL 15, 2008 |
| | ) | 08CV2146          TG |
| Plaintiff, | ) | JUDGE CONLON |
| | ) | MAGISTRATE JUDGE KEYS |
| v. | ) | Case No.: _____ |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| JOHN O'LEARY, RENEE O'LEARY, JACK O'LEARY, JOHN MULHERN AND MARLENE MULHERN | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Liberty Insurance Underwriters, Inc. ("Liberty"), by its attorneys, Meckler Bulger & Tilson LLP, for its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and the common law, states as follows:

### I.     THE PARTIES

1.      Liberty is a New York corporation with its principal place of business in New York, New York, that at all relevant times was licensed to transact, and transacted business in the State of Illinois, including Cook and DuPage County, Illinois.

2.      Defendants John J. O'Leary and Renee O'Leary are residents of the Village of Elmhurst, County of DuPage, State of Illinois.  Additionally, John J. O'Leary is an attorney licensed to practice law in the State of Illinois.

3.      Defendant Jack O'Leary is a resident of the Village of River Forest, Cook County, Illinois.  John, Renee and Jack O'Leary are hereinafter collectively referred to as the "O'Learys."

4.      Defendants John and Marlene Mulhern are residents of the Village of Riverside, Cook County, Illinois and are hereinafter collectively referred to as the "Mulherns."

## II.    JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity between Liberty and all defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) on the basis that the Defendants all reside in the District, the contract of insurance was entered into in the District, and a substantial part of the events or omissions giving rise to matters alleged in this Complaint occurred in this District.

## III.    RELEVANT FACTS

### B.    THE UNDERLYING LAWSUIT

7.      This is an insurance coverage dispute arising out of lawsuit previously filed by the O'Learys against the Mulherns, styled *John O'Leary, Renee O'Leary and Jack O' Leary v. John and Marlene Mulhern,* Case No. 07M4206, Circuit Court of Cook County, Illinois (the "Underlying Lawsuit"). Copies of the Amended Complaint filed by the O'Learys, the Counterclaim filed by the Mulherns, and the Answer to Counterclaim filed by the O'Learys in the Underlying Lawsuit are attached hereto as Exhibits 1, 2 and 3, respectively.

8.      As alleged in the Underlying Lawsuit, the O'Learys and the Mulherns entered into a joint venture agreement, the object of which was to enable the Mulherns to purchase a property located in Hinsdale, Illinois. (*See* Amended Complaint 1 at ¶¶ 4-8, 15; Counterclaim ¶¶ 1-7)   The O'Learys and the Mulherns executed an operating

2

agreement governing the joint venture (the "Operating Agreement").  A copy of the Operating Agreement was attached by the O'Learys to the Amended Complaint and by the Mulherns to their Counterclaim, both as Exhibit A to those respective pleadings.  (*See* Exhibits 1 and 2 at Exhibit A)

9.    Pursuant to the Operating Agreement, "the capital interest of each Joint Venturer shall consist of his original contribution of capital . . ." (Operating Agreement at p. 6, § 7.1)

10.    As their original capital investment to the joint venture, the O'Learys collectively contributed $80,000 and the Mulherns collectively contributed $80,000. (*See* Amended Complaint at ¶¶ 4-8, 15; Counterclaim at ¶¶ 15-16; Operating Agreement at p. 6, § 7.2))  Specifically, John J. O'Leary and his wife, Renee O'Leary jointly contributed $60,000 of a total $160,000 capital contribution -- 37.5% of the total initial investment. (Id. at § 7.2)  Accordingly, John J. O'Leary owned in excess of 10% interest in the joint venture, and with his wife, Renee O'Leary, in excess of 35%.

11.    Pursuant to the Operating Agreement the Mulherns were to sell the Hinsdale property after building a home thereupon, and were to provide the O'Learys, collectively, a 50% share of the profits of the sale. (*See* Amended Complaint at ¶¶ 10; Counterclaim at ¶ 4; Answer to Counterclaim at ¶ 4; Operating Agreement at pp. 5-7) The Operating Agreement was drafted by John J. O'Leary, for which he billed the joint venture $150.00 in attorney's fees.  (Counterclaim at ¶ 4; Answer to Counterclaim at ¶ 4; Operating Agreement at p. 14)

12.    The O'Learys alleged that the Mulherns did not commence construction at the Hinsdale property and instead put the lot on the market for sale without providing the

O'Learys the proper return on their investment. (Id. at ¶¶ 16-17) The O'Learys alleged that their initial investment was given in exchange for a promissory note containing terms of repayment and that accordingly the Mulherns failure to repay the O'Learys under the terms of that note constituted a breach of contract. (Amended Complaint at Count I) The O'Learys further alleged that John Mulhern individually committed fraud in connection with inducing them into entering the joint venture. (Id. at Count II) The O'Learys sought $92,000 in compensatory damages, plus interest, plus punitive damages. (Id.) The O'Learys further sought dissolution of the joint venture. (Id. at Count III)

13.    In response, the Mulherns generally denied the O'Learys allegations, set forth various affirmative defenses and filed a Counterclaim alleging that they retained John O'Leary to represent them with respect to purchase of the Hinsdale property. (Counterclaim at ¶ 1) They further alleged that the O'Learys breached the Operating Agreement by failing to "cooperate" with John Mulhern and refusing to discuss the prospect of making of additional capital contributions. (*See* Id. at ¶¶ 6-12) The Mulherns further alleged that the $80,000 at issue was a capital investment into the joint venture pursuant to the terms of the Operating Agreement, and not a loan as characterized by the O'Learys. (*See* Id. at ¶¶ 13-22) Accordingly, the Mulherns sought a declaration that, *inter alia,* the $80,000 initial investment by the O'Learys was governed solely by the terms of the Operating Agreement and not a loan subject to the repayment terms set forth in the installment note. (Id.) Finally, Mulherns alleged that John J. O'Leary, as their attorney, breached a fiduciary duty to them by *inter alia* simultaneously (and in a conflict of interest) acting as: (1) their attorney in the purchase of the subject property; (2) as a joint venturer with Mulherns; and (3) as a lender to Mulherns. (Id. at ¶¶ 23-27)

4

**B.    THE CLAIM**

14.    John J. O'Leary is the only named insured under "claims made and reported" Illinois Lawyer's Professional Liability Insurance, Policy No. LPA201972-016, with a policy period of June 10, 2006 to June 10, 2007 (the "Policy") issued by Liberty. A true and correct copy of the Policy is attached hereto as Exhibit 4.

15.    On or about June 13, 2007, John J. O'Leary provided written notice of the Mulherns' Counterclaim to Liberty. A copy of that notice is attached hereto as Exhibit 5.

16.    Subsequently, Liberty, both directly and through its counsel, spoke with John J. O'Leary who reiterated his representation made in his June 13, 2007 letter that he had not submitted the Mulhern counterclaim to Liberty for defense or indemnification, but rather simply provided it to Liberty so that it had "notice."

17.    On or about September 11, 2007, counsel for Liberty sent a letter to Mr. O'Leary seeking an acknowledgement, in writing, that he was not seeking coverage under the Policy with respect to the Mulhern Counterclaim. A copy of the September 11, 2007 letter is attached hereto as Exhibit 6.    Liberty received no response.

18.    Subsequently, counsel for Liberty spoke with an attorney later retained by John J. O'Leary, Thomas Morrissey ("Mr. Morrissey").    Counsel for Liberty reiterated that Liberty took the position that the Mulhern Counterclaim was not covered under the Policy. After a series of telephone calls, Mr. Morrissey ultimately requested that Liberty provide a defense to Mr. O'Leary with respect to the Counterclaim.

19.    In response, counsel for Liberty provided Mr. Morrissey with a copy of the Policy, reiterating Liberty's position that the Mulhern Counterclaim was not covered under the Policy, asking that Mr. O'Leary withdraw the claim.

5

20.     On or about November 12, 2007, counsel for Liberty sent a letter to Mr. Morrissey, again setting forth Liberty's position that the Mulhern Counterclaim was not covered under the Policy, and requesting that Mr. O'Leary sign a written acknowledgment of the same. A copy of this letter is attached hereto as Exhibit 7.

21.     To date, Liberty has not received any response to its November 12, 2007 letter and phone calls to Mr. Morrissey have gone unreturned. Accordingly, an actual, justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between the parties and Liberty brings this action pursuant to 28 U.S.C. § 2201 and the common law, seeking a declaration from this Court that it has no obligation to defend or indemnify John J. O'Leary with respect to the Mulhern Counterclaim.

## COUNT I
### (Declaratory Judgment with Respect to Exclusion 3 of The Policy)

22.     Liberty realleges and incorporates by reference paragraphs 1 through 21 as if fully set forth herein as paragraph 22 of Count I.

23.     Exclusion 3 of the Policy, provides as follows:[1]

1.     **Certain Services and Capacities.** This policy does not apply to any **claim** arising out of **your** services and/or capacity as:

    a.     an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;

    b.     a public official, or an employee of a governmental body, subdivision, or agency;

    c.     a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments thereto, or similar federal, state, local or common law, or any regulation or order issued pursuant thereto, except if **you** are deemed to

---

[1]     Bolded terms, appear in the original and indicate that such terms are defined in the Policy.

be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan.

24.     It is undisputed by the parties to the Underlying Lawsuit that John J. O'Leary was a partner in the joint venture. (*See, e.g.,* Amended Complaint at ¶¶ 4, 10; Counterclaim at ¶¶ 2, 15, 26f; *see also, generally* Operating Agreement)

25.     Further, the Counterclaim clearly alleges that John J. O'Leary breached his obligation as a partner of the joint venture as set for the in the Operating Agreement. (*See* Counterclaim at ¶¶ 7-12 (Count I, alleging breach of the Operating Agreement; ¶¶ 13-22 (Count II, seeking declaration that Mr. O'Leary's obligations as a partner in joint venture are governed by the Operating Agreement); ¶¶ 23-27 (Count III, alleging breach of fiduciary duty by John J. O'Leary for acting in conflict as attorney for joint venture and partner in joint venture)).

26.     Accordingly, the Mulherns' Counterclaim arises out of John J. O'Leary's capacity as a partner in the joint venture and is thus excluded from coverage by operation of Exclusion 3 of the Policy. (*See generally,* Amended Complaint; Counterclaim)

WHEREFORE, Liberty requests that this Court enter a declaration that Liberty has no duty to defend or indemnify John J. O'Leary with respect to the Mulhern Counterclaim.

## COUNT II
### (Declaratory Judgment with Respect to Exclusion 6 of The Policy)

27.     Liberty realleges and incorporates by reference paragraphs 1 through 26 as if fully set forth herein as paragraph 27 of Count II.

28.     Exclusion 6. of the Policy, provides as follows:[2]

---

[2]     Bolded terms, appear in the original and indicate that such terms are defined in the Policy.

6.    **Equity Interests.**  If a person insured under this policy owns, along with his or her spouse, ten percent (10%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective equity interest of:

a.    all persons and entities insured under this policy;

b.    spouses of persons insured under this policy; and

c.    the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.

29.    John J. O'Leary owned in excess of 10% interest in the joint venture, and with his wife, Renee O'Leary, in excess of 35% and thus Exclusion 6 precludes coverage of the Mulhern Counterclaim.

30.    Specifically, pursuant to the Operating Agreement, "the capital interest of each Joint Venturer shall consist of his original contribution of capital . . ." (Operating Agreement at p. 6, § 7.1)

31.    Pursuant to the Operating Agreement, John J. O'Leary and his wife, Renee O'Leary jointly contributed $60,000 of a total $160,000 capital contribution -- 37.5% of the total. (Id. at § 7.2)

32.    Accordingly, John and Renee O'Leary jointly owned 37.5% of the capital of the joint venture which is in excess of the 35% and 10% threshold amounts set forth in Exclusion 6 of the Policy.

33.    With respect to the 10% threshold, the Mulherns alleged that John J. O'Leary represented the joint venture as an attorney in the purchase of the subject property, and in the drafting of documents related thereto. (*See* Counterclaim at ¶¶ 23-27; Answer to Counterclaim at ¶ 4)  Further, John J. O'Leary alleged that he did in fact draft the Operating Agreement, for which he billed the joint venture $150.00. (Amended Complaint at ¶10; Answer to Counterclaim at ¶ 4; Operating Agreement at p. 14).

34.    Accordingly, John J. O'Leary is a person insured under this policy who owns, along with his spouse, ten percent (10%) or more of the portions of the capital of the joint venture and he simultaneously provided professional legal services with respect to that joint venture.  Therefore, the Policy does not provide coverage for the Mulhern Counterclaim which arises from those professional services (*See* Counterclaim Count III).

WHEREFORE, Liberty requests that this Court enter a declaration that Liberty has no duty to defend or indemnify John J. O'Leary with respect to the Mulhern Counterclaim.

Date:   April 11, 2008                     Respectfully submitted,

                                           **LIBERTY INTERNATIONAL
                                           UNDERWRITERS INC.**


                                           _____/s/_ Jonathan D. Lichterman_____
                                           Bruce R. Meckler
                                           Christopher E. Kentra
                                           Jonathan D. Lichterman
                                           MECKLER BULGER & TILSON LLP
                                           123 N. Wacker Drive, Suite 1800
                                           Chicago, IL  60606
                                           Tel.:  (312) 474-7900
                                           Fax:  (312) 474-7898

M:\12134\pleading\DJ Complaint oleary.doc

# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT CHANCERY DIVISION**

| | | |
|---|---|---|
| JOHN O'LEARY, RENEE O'LEARY and JACK O'LEARY | ) ) ) | |
| Plaintiff(s) | ) ) | |
| -v- | ) ) ) | No.  07 M4 206 (transferred to Chancery) |
| JOHN and MARLENE MULHERN | ) ) ) | |
| Defendant(s). | ) | |

## Amended Complaint

Plaintiffs, John J. O'Leary, Renee O'Leary, and Jack O'Leary, by their attorneys, The Law Offices of Thomas A. Morrissey, and for their Amended Complaint against defendants John Mulhern and Marlene Mulhern state as follows:

1. Plaintiffs, John O'Leary and Renee O'Leary, reside in the Village of Elmhurst, County of DuPage, State of Illinois.

2. Plaintiff, Jack O'Leary resides in the Village of River Forest, County of Cook, State of Illinois.

3. Defendants, John and Marlene Mulhern, are individuals residing at 282 Maplewood, Village of Riverside, County of Cook, Illinois.

4. On July 19, 2005, a joint venture between the Plaintiffs John O'Leary, Renee O'Leary, Jack O'Leary, and the defendants, John and Marlene Mulhern, was organized for the purpose of the purchase, demolition of the existing property, rebuild and resale of property in Hinsdale, Illinois.

5. Specifically, the joint venture was organized for the purpose of purchasing the property located at 341 E. Chicago, Village of Hinsdale, State of Illinois, (hereinafter the "Hinsdale Property"), demolishing the existing structure, constructing a new house and reselling the property.

6. In order to induce the plaintiffs into joining into the joint venture, defendant John Mulhern advised John O'Leary he individually had secured financing for both the demolition and the construction of the Hinsdale Property.

7. As further inducement to organize the joint venture, defendant John Mulhern advised plaintiff John O'Leary that he and his company, Mulhern Construction would break ground on the new property as soon as a project he had completed in Riverside, Illinois (hereinafter the "Riverside Property") was sold.

8. Based upon these representations and assurances, the plaintiffs invested $80,000.00 into the joint venture to fund the purchase of said property

9. In exchange, the defendants provided the Plaintiffs with a Promissory note and a Mortgage of the Hinsdale property (See attached Exhibit B, Installment note of July 19, 2005 and Exhibit C Mortgage dated July 19, 2005).

10. The Joint Venture was formed on July 19, 2005 under an Operating agreement attached hereto as Exhibit A.

11. On July 19, 2005, defendants, John and Marlene Mulhern purchased said property with joint venture assets and placed said property in their own name.

12. Although Defendant Mulhern assured the Plaintiffs that the Hinsdale property would be placed in the name of a succeeding Limited Liability Company, Defendants have yet to make said transfer and since July 2005, the property remains in the name of the defendants as sole owners.

13. Since the date of the purchase the Hinsdale property has been under the sole and exclusive control of the Defendants.

14. John Mulhern sold the Riverside property in December, 2005.

15. Since that date. at the Defendants request, from July 19, 2005 to April, 2006 the Plaintiffs had made $12,000.00 in mortgage payments for the premises in the Defendant's name.

16. Since the formation of the Joint Venture, and the purchase of the Hinsdale property, no demolition has proceeded on the Hinsdale property, no new construction has proceeded on the Hinsdale property, and there has been no resale of the property or distribution of assets.

17. Rather than proceeding with their duties pursuant to verbal agreement and the Joint Venture operating agreement, Defendants have not initiated demolition of the existing property but have rather, in November 14, 2006 listed the existing property for sale.

## Count I
### (Breach of Contract)

1-17.  Plaintiffs re-allege and incorporate by reference Paragraphs 1-17 of this Amended Complaint as Paragraphs 1-17 of this Count I as though fully set forth herein.

18. The Plaintiffs and Defendants entered into a valid written contract, a copy of which is attached hereto as Exhibit B.

19. By the terms of the contract, Defendant agreed to Plaintiffs the principal sum of $80,000 with interest until the maturity date of January 19, 2007 at the rate of 5% per annum starting on the 19th day of August and on the 19th of each month until the maturity date.

20. Plaintiffs have performed all of the conditions on their part under the terms of the contract.

21. Defendants failed to fulfill the contract on their part, and despite repeated assurances made by defendant John Mulhern to pay the principal pursuant to the note have refused to make any payments since the note was executed.

22. Plaintiffs have been damaged in the amount of $92,000 plus 5% interest as a direct and proximate cause of the breach.

WHEREFORE for the foregoing reasons, JOHN O'LEARY, RENEE O'LEARY and JACK O'LEARY hereby pray for entry of judgment in their favor an against Defendant JOHN AND MARLENE MULHERN in an amount of $92,000, plus punitive damages to be determined by this court, reasonable attorney fees, interest, costs, and for such other and further relief that this court deems reasonable and just.

## Count II
### (Dissolution of Joint Venture)

1-22   Plaintiffs re-allege and incorporate by reference Paragraphs 1-17 of this Amended Complaint as Paragraphs 1-17 of this Count II as though fully set forth herein.

23. On July 19, 2005, Plaintiffs and Defendants entered into a joint venture governed by Illinois Law.

24. Said Joint Venture specifically omitted any reference to the length of term of the joint venture (Exhibit B, Section III).

25. Said Joint Venture does allow for dissolution of the Joint Venture by operation of law. (Exhibit B Section 11.1 (c)).

26. The Defendants have willfully violated the operating agreement by failing to perform their obligations as joint adventurers including, but not limited to their:

   a) failure to provide financing for the demolition and construction as promised.
   b) failure to commence demolition and construction of the Hinsdale property.
   c) failure to transfer the Hinsdale property to a successor Limited Liability Company.
   d) failure to pay the promissory note executed in this regard.
   e) listed the Hinsdale property without consulting the Plaintiffs.
   f) acting otherwise in violation of the best interest of the Joint Venture.
   g) failure to contribute to and to fund the Joint Venture as required by the agreement.
   h) otherwise failed in their obligations as Joint Adventurers.

27. Plaintiffs seek an order from this court dissolving the Joint Venture agreement as the Plaintiffs have been wrongfully precluded from participation in the business of the joint venture.

28. The assets of the joint venture are of greater value together and no equitable division of the assets can be made without loss and prejudice to the parties.

WHEREFORE for the foregoing reasons, JOHN O'LEARY, RENEE O'LEARY and JACK O'LEARY hereby pray for entry of judgment in their favor and against Defendants JOHN AND MARLENE MULHERN.; that the Joint Venture known as the 341 Chicago Joint Venture be dissolved, that an accounting be rendered to determine the true value of said property, that a receiver be appointed to sell the subject property and for such other and further relief that this court deems reasonable and just.


## Count III
### (Fraud vs. John Mulhern)

Plaintiffs, pleading in the alternative and pursuant to Section 2-613 (b) of the Illinois Code of Civil Procedure further complains against Defendant John Mulhern:

   1-17.   Plaintiffs re-allege and incorporate by reference Paragraphs 1-17 of this Amended Complaint I as Paragraphs 1-17 of this Count III as though fully set forth herein.

18. Defendant John Mulhern, had a duty to disclose any material facts and to avoid misleading the Plaintiffs about the Hinsdale Property in recruiting them to the Joint Venture.

19. Defendant John Mulhern's statements to the Plaintiffs that he had obtained financing for the demolition and the new construction of the Hinsdale Property and that he would begin demolition and construction of the Hinsdale property after the sale of the Riverside property both prior to and after the execution of the Joint Venture agreement were false and misleading.

20. Defendant John Mulhern's statements to the Plaintiffs purposely and willfully concealed material facts to the Plaintiffs.

21. The false and misleading statements of Defendant John Mulhern materially altered the potential benefit the Joint Venture might bring the Plaintiffs.

22. Plaintiffs detrimentally relied upon the false and misleading statements of Defendant John Mulhern made regarding the funding the construction of the Hinsdale Property and in recruiting them to join in the Joint Venture.

23. Had the Plaintiffs known that John Mulherns statements were false, they would not have entered into the Joint Venture agreement.

WHEREFORE for the foregoing reasons, JOHN O'LEARY, RENEE O'LEARY and JACK O'LEARY hereby pray for entry of judgment in their favor an against Defendant JOHN MULHERN in an amount of $92,000, plus punitive damages to be determined by this court, reasonable attorney fees, interest, costs, and for such other and further relief that this court deems reasonable and just.

Respectfully Submitted

Attorney for Plaintiffs

17001
Thomas A. Morrissey
Law Offices of Thomas A. Morrissey
102 W. Burlington
La Grange, Illinois 60525
708.352.3790

# OPERATING AGREEMENT FOR
## 341 E. Chicago Joint Venture

**THIS** is entered into this _19th_ day of _July_____, 2005, by and between John J. O'Leary, Renee Norgle O'Leary and Jack O'Leary, John and Marlene Mulhern herein collectively referred to as the joint venturers.

## ARTICLE I

### Section 1.1 – Name

The Joint Venture shall operate under the name of 341 E. Chicago Joint Venture.

### Section 1.2 – Location

The address of the principal place of business of the JOINT VENTURE shall be: 120 S. State Street, Suite 200, Chicago, IL 60603, or such other place of business as may be agreed upon by the Joint Venturers from time to time.

### Section 1.3 – Formation

The Joint Venturers hereby enter into and form this JOINT VENTURE for the limited purposes set forth herein. Except as otherwise provided herein, the rights and obligations of the Joint Venturers and the administration and termination of the JOINT VENTURE shall be governed by the Illinois law. A Joint Venturers interest in the JOINT VENTURE shall be personal property for all purposes. All real and other property owned by the JOINT VENTURE shall be deemed to be owned by the JOINT VENTURE, as an entity and no Joint Venturer, individually, shall have ownership of such property.

### Section 1.4 – Organizational Documents

The Joint Venturers shall promptly execute all documents and make all such filings and recordings and perform such other act as may now or hereafter be necessary or desirable to comply with the requirements of applicable laws for the organization and formation of the JOINT VENTURE and for the commencement and carrying on of the JOINT VENTURE in accordance with this Operating Agreement.

## ARTICLE II
## PURPOSE OF THE BUSINESS

### Section 2.1 – Purpose

The purpose for which the JOINT VENTURE is organized is to invest money in the purchase

1



**EXHIBIT**

_A_

of a house and lot, construction of a house, and sale of a house and lot on the certain real property, business, and improvements commonly known as 341 E. Chicago ("the Property"). The Joint Venturers acknowledge that each of them is employed in various other enterprises not related to the Property.

## Section 2.2 - Powers

The JOINT VENTURE shall, except as otherwise expressly provided herein, have all powers necessary, desirable and incidental to the implementation of its purposes. In no event shall any action or decision by the Joint Venturers, or any one of them, have the effect of extending the purposes of the JOINT VENTURE as set forth in this Article II or permitting the incurring of expenses or liabilities for other purposes, except for obligations imposed upon the JOINT VENTURE by law, unless such action or decision is approved by the unanimous consent of the Joint Venturers. Except as otherwise provided herein, no Joint Venturer shall have any authority to act for, or to assume obligations or responsibilities on behalf of any other Joint Venturer or the JOINT VENTURE.

## Section 2.3 - Limit of Scope

The JOINT VENTURE has been formed only for the purposes specified in this Article II at Section 2.1 and this Agreement shall not be deemed to create any legal relationship between the Joint Venturers with respect to any other activities whatsoever other than the activities contemplated by or incident to this Agreement.

## Section 2.4 - No Restrictions Upon Competition

Neither this Agreement nor the relationship created hereunder shall restrict in any way the conduct by any Joint Venturer of any business or activity including the acquisition, development and operation of real property, including real property improved, without accountability to the JOINT VENTURE or any Joint Venturer, even if such business or activity competes with the business of the JOINT VENTURE.

## ARTICLE III
## TERM OF THE JOINT VENTURE

The JOINT VENTURE commenced on ___July 19_____, _2005____ ,and shall continue until terminated as provided herein.

2

Left intentionally blank

## ARTICLE IV
## ACCOUNTING METHOD

The JOINT VENTURE shall keep its accounting records and shall report its income for income tax purposes of the cash method of accounting. The accounting for JOINT VENTURE purposes shall be in accordance with generally accepted accounting principles consistently applied.

## ARTICLE V
## BOOKS AND RECORDS

### Section 5.1

The JOINT VENTURE books, accounts and records shall be kept at the principal place of business of the JOINT VENTURE.

### Section 5.2

The Chairman (as defined herein) shall, for the benefit of the JOINT VENTURE, keep or have kept accurate, full and complete books and accounts showing the JOINT VENTURE's assets and liabilities, operations, transactions and financial condition. Each Joint Venturer shall cause all of its transactions on behalf of the JOINT VENTURE to be reflected in said books and records. The Joint Venturers shall, pursuant to Section 9.1, from time to time determine the methods to be used in the preparation of financial statements and Federal, state and municipal income and other tax returns for the JOINT VENTURE in connection with all items of income and expense, including without limitation, valuation of assets, the methods of depreciation, tax elections, credits and accounting procedures.

### Section 5.3

The Chairman shall cause to be furnished to each Joint Venturer, as soon as practical after the end of each fiscal year of the JOINT VENTURE, a general accounting and audit covering the assets, properties, liabilities and net worth of the JOINT VENTURE and its transactions and operations during such fiscal year, and all matters and things customarily included in such accounts and audits, and a full detailed statement shall be furnished to each Joint Venturer within ninety (90) days after the end of such fiscal year, showing the assets, liabilities, net worth, profits, losses, net income (or net loss) and cash flow (or deficit cash flow) for such fiscal year.

### Section 5.4

3

The JOINT VENTURE shall be treated and shall file its tax returns as a partnership for Federal, state and municipal income tax and other tax purposes.

## Section 5.5

The fiscal year of the JOINT VENTURE shall be the calendar year.

4

## ARTICLE VI
## CAPITAL CONTRIBUTIONS

### Section 6.1- Initial Capital Contributions

The Joint Venturers have made or shall make within fifteen (15) days hereof contributions to the capital of the JOINT VENTURE of cash in the amounts opposite their respective names in Sec 7.2. In the event a Joint Venturer does not contribute his proportionate share of capital as set forth and as heretofore required within fifteen (15) days hereof, the defaulting Joint Venturers contribution will be paid by the Chairman and the defaulting Joint Venturer's interest in the JOINT VENTURE and its profits and losses of the JOINT VENTURE will revert to the Chairman. No interest shall accrue on any capital contributions to the JOINT VENTURE, and no Joint Venturer shall have the right to withdraw or be repaid any capital contributed by him, except as specifically provided in this agreement. No Joint Venturer shall be required to make any additional contributions to the capital of the JOINT VENTURE except as set forth in this Section 6.2.

### Section 6.2- Additional Capital Contributions

The JOINT VENTURE may borrow substantial amounts of money and incur substantial losses during its initial years of operation. Therefore, upon a majority vote of the Joint Venturers pursuant to Section 9.1, the Joint Venturers agree to contribute additional capital as needed by the JOINT VENTURE in their respective JOINT VENTURE interest percentages. In the event a Joint Venturer does not contribute its proportionate share of additional capital as heretofore required by the JOINT VENTURE, and said failure shall continue for a period of thirty (30) days after written notice thereof, then the defaulting Joint Venturer shall be notified in writing that if the deficiency is not cured within the next thirty (30) calendar days, the defaulting Joint Venturer's interest in the JOINT VENTURE's profits and losses shall be fully diluted. Consequently, even a partial deficiency shall result in full dilution of the defaulting Joint Venturer's interest in the JOINT VENTURE and shall further result in the loss of all voting rights otherwise granted to such defaulting Partner pursuant to Section 9.1 hereof. In such event, the defaulting Joint Venturer's share of profit and losses shall be reallocated to the remaining Joint Venturers in the ratio of their respective shares of profits and losses or to the Joint Venturer who makes up the defaulting Joint Venturer's deficiency. No capital contributions shall be required of any Joint Venturer except pursuant to this Article VI. No Joint Venturer shall have the right to make capital contributions to the JOINT VENTURE except pursuant to this Article VI. Capital contributions shall not bear interest.

# ARTICLE VII
## CAPITAL ACCOUNTS; DRAWING ACCOUNTS

### Section 7.1 - Capital Accounts

An individual capital account shall be maintained for each Joint Venturer. The capital interest of each Joint Venturer shall consist of his original contribution of capital, increased by (1) additional cash contributions or the value of the property (as determined by the Joint Venturers) contributed to the capital of the JOINT VENTURE and (2) any credit balances transferred from his drawing account to this capital account and decreased by (a) distributions of cash or the value of the property (as determined by the Joint Venturers) distributed to each Joint Venturer and reduction of JOINT VENTURE capital and (b) his share of JOINT VENTURE losses, if charged to the capital account of the Joint Venturers. Capital accounts shall be adjusted to reflect any adjustments in items reported by the JOINT VENTURE's Federal income tax return that result from amended returns filed by the JOINT VENTURE or pursuant to an agreement by the JOINT VENTURE with the Internal Revenue Service or on account of a final determination by a court relative to any Federal income tax return filed by the JOINT VENTURE.

### Section 7.2 – Initial Capital Accounts

The Joint Venturers shall make a contribution to their respective capital accounts in the following amounts:

| Joint Venturers | Capital Contribution |
| --- | --- |
| John J. O'Leary, Renee O'Leary | $60,000.00 |
| Jack O'Leary | $20,000.00 |
| John and Marlene Mulhern | $80,000.00 |

# ARTICLE VIII
## PROFITS AND LOSSES

### Section 8.1- Distribution

6

All distributions of net profit or surplus of the JOINT VENTURE shall be distributed to each Joint Venturer in the following proportions:

John and Marlene Mulhern    50%

John O'Leary, Renee O'Leary
and Jack O'Leary         50%

The net losses of the JOINT VENTURE shall be distributable to each Joint Venturer in the following order:

First to and among the Joint Venturers in proportion to the balances in their respective capital accounts until the capital accounts of all Joint Venturers are reduced to zero; and

## ARTICLE IX
## ADMINISTRATIVE PROVISIONS

### Section 9.1 - Voting

The Joint Venturers shall have one (1) vote for each one percent (1%) of their net profits and losses. The vote of each Joint Venturer shall be in writing and shall be directed to the principal place of business of the JOINT VENTURE. A simple majority vote will be required to pass any resolution pertaining to the management and operation of the JOINT VENTURE and its assets.

### Section 9.2 - Sale of Interest, Property and Assets

If a Joint Venturer or Joint Venturers who individually or together have a majority interest in the JOINT VENTURE elect to sell their Joint Venturership interest to a non-Joint Venturer, said Joint Venturer or Joint Venturers shall be required to sell not only their own interest in the JOINT VENTURE, but 100% of the JOINT VENTURE's property and assets. To the extent this Section 9.2 is read as being in conflict with any other section of this Operating Agreement, this section shall apply.

### Section 9.3 - Holding Title and Contracting in Joint Venture Name

7

Unless otherwise approved by the Joint Venturers pursuant to Section 9.1, title to JOINT VENTURE assets shall be held and all obligations incurred and contracts and other relationships entered into by the JOINT VENTURE or any Joint Venturer authorized to Act on behalf of or for the benefit of, the JOINT VENTURE, shall be made or taken in the name of the JOINT VENTURE.

## Section 9.4 - Bank Accounts

The JOINT VENTURE shall maintain such bank accounts as the Joint Venturers shall determine. Checks shall be drawn for JOINT VENTURE purposes only, and may be signed by any person designated by vote of the Joint Venturers pursuant to Section 9.1. All monies received by the JOINT VENTURE shall be deposited in such account or accounts.

## Section 9.5 - Management

Management is vested in whole or in part in the Joint Venturers. The Joint Venturers shall appoint a Chairman to oversee the development and management of the Property and the business and improvements located thereon. He may engage himself or a company controlled by him at reasonable compensation for the day-to-day management or sale of the JOINT VENTURE property and the business and improvements located thereon.

Any change in management, including replacement of the Chairman, must be approved by the Joint Venturers pursuant to Section 9.1. The Chairman shall have the authority to execute all documents necessary to effectuate the aforesaid authority. This agreement will be changed to an S Corp or LLC form of ownership upon request of 50% of the Joint Venturers.

Upon death or legal incapacity of the Chairman, the Joint Venturers shall vote pursuant to Section 9.1. to appoint a new Chairman.

### Section 9.6 - Assignment of Interest

Any Joint Venturer may assign, transfer or bequeath his Joint Venturership interest to his children without the consent of the other Joint Venturers. If a Joint Venturer assigns or bequeaths his interest to his child or children said child or children shall be automatically considered a "substituted Joint Venturer" and shall have all the rights and powers of his predecessor and shall be subject to all the obligations and restrictions set forth in this Operating Agreement as though the substituted Joint Venturer were an original Joint Venturer. However, consent of the Joint Venturers pursuant to Section 9.1 is required in order for an assignee or donee to assign, transfer or bequeath his Joint Venturership interest to any other person or other entity.

Consent of the Joint Venturers pursuant to Section 9.1 is required in order for an assignee or donee of an interest in the JOINT VENTURE to have a right to participate in the management of the business and affairs of the JOINT VENTURE or to become a Joint Venturer. This consent requirement restricts only the transferability of management and voting rights, but does not prevent the transferability of the financial or economic rights associated with the Joint Venturership interest.

An assignee or donee who by consent of the Joint Venturers pursuant to Section 9.1 is entitled to all the rights of a Joint Venturer shall be considered a "substituted Joint Venturer" and shall have all the rights and powers of his predecessor and shall be subject to all the obligations and restrictions set forth in this Operating Agreement as though the substituted Joint Venturer were an original Joint Venturer.

## ARTICLE X
## RESTRICTIONS

### Section 10.1 - Restriction or Mortgage of Joint Venturer's Interest

No Joint Venturer shall, except by vote pursuant to Section 9.1 or by reason of death or legal incapacity, assign, pledge, mortgage, transfer, bequeath, or sell his interest in the JOINT VENTURE or its capital accounts or Property, or enter into any Agreement as a result of which any person other than the parties hereto shall become interested with or in place of him in the JOINT VENTURE, or do any act detrimental to the best interest of the JOINT VENTURE or which would make it impossible to carry on the ordinary business of the JOINT VENTURE. Any transfer of an interest in the JOINT VENTURE by a Joint Venturer in violation of the terms of this Section shall be void and of no effect.

### Section 10.2 - Additional Restrictions on Joint Venturers

Except as may be specifically provided for in this Agreement, no Joint Venturer, without the consent and approval of the Joint Venturers pursuant to Section 9.1, shall:

9

1. Borrow or lend money on behalf of the JOINT VENTURE.
2. Execute any mortgage, bond, lease or contract of sale of the JOINT VENTURE property.
3. Assign, transfer, or pledge any debts due the JOINT VENTURE or release any debts due, except on payment in full.
4. Compromise any claim due the JOINT VENTURE or submit to arbitration any dispute or controversy involving the JOINT VENTURE.
5. Sell, assign, pledge or mortgage his interest in the JOINT VENTURE.
6. Sign any document that would be binding on the JOINT VENTURE.

## Section 10.3 - Effect of Prohibited Transfers

If the JOINT VENTURE is caused to be terminated for Federal income tax purposes as a result of any transfer of an interest in the JOINT VENTURE in violation of this Agreement, the taxable income and loss of the JOINT VENTURE for Federal income tax purposes as a result of any transfer of an interest in the JOINT VENTURE in violation of this Agreement, the taxable income and loss of the JOINT VENTURE for income tax purposes, and the items of other income, gain, loss, deduction and credit, if any, that require separate computation under the Internal Revenue Code, of the Joint Venturer who caused the termination and the other Joint Venturers shall be specially allocated among the Joint Venturers such the Joint Venturers who did not cause the termination are indemnified and held harmless, to the extent possible, from and against the loss of any tax benefit and from and against the imposition of any tax liability caused by such termination for Federal income tax purposes.

## ARTICLE XI
## DISSOLUTION, TERMINATION AND CONTINUATION
## OF THE JOINT VENTURE; AND LIQUIDATING DISTRIBUTIONS

## Section 11.1 - Dissolution

Dissolution shall occur upon the occurrence of any of the following events:

(a) The Joint Venturers agree by vote taken pursuant to Section 9.1 to terminate the JOINT VENTURE; or

(b) The JOINT VENTURE ceases to maintain any interest (which terms shall include but not be limited to a security interest) in the Property and the improvements thereon, or any property exchanged therefore or in a partnership, joint venture, corporate or other entity that owns an interest (including a security interest) in the Property or any real property exchanged therefore;

10

(c)    The JOINT VENTURE is dissolved by operation of law.

(d)    The property that is located at 341 E. Chicago, Hinsdale, Illinois is sold by John Mulhern, Mulhern Builders or any entity controlled by John or Marlene Mulhern.

Upon dissolution, the Chairman shall cause written notice of said dissolution to be provided to the other Joint Venturers.

## Section 11.2 - Negation of Right to Dissolve by Will of Joint Venturer

Except as set forth in Section 11.1, no Joint Venturer shall have the right to dissolve the JOINT VENTURE by its express will or withdrawal without the consent of the Joint Venturers, as provided in Section 9.1. Upon any dissolution, occurring by operation of law in contravention of this Agreement caused by the express will or withdrawal of a Joint Venturer, the Joint Venturers not causing said dissolution shall be the Liquidating Joint Venturers.

## Section 11.3 - Liquidation

If the JOINT VENTURE shall be dissolved for any reason which results in one or more Joint Venturers becoming liquidating Joint Venturers as provided in this Article XI, then such Joint Venturers shall have the exclusive right to conduct the liquidation of the JOINT VENTURE and to make all decisions and execute documents relating thereto pursuant to Section 9.1 and the other Joint Venturers shall not have the right to participate therein. In all other cases, the Joint Venturers shall all be liquidating Joint Venturers and shall jointly conduct the liquidation of the JOINT VENTURE and shall jointly make all decisions and execute documents relating thereto pursuant to Section 9.1. In any event, the liquidating partners shall wind up the affairs of the JOINT VENTURE, cause the JOINT VENTURE's assets to be sold and make the distributions provided in Section 11.4.

## Section 11.4 - Distribution of Proceeds of Liquidation

The proceeds from liquidation shall be applied and distributed in the following order of priority:

(a)    First to the payment of:

(i)    The cost to remove the current residence, build a new residence and pay Mulhern builders a fee based on 15% of the cost of the construction of the new residence.

(ii)    All closing costs, marketing costs and title charges related to the sale of the new residence.

11

  (iii) debts and liabilities of the JOINT VENTURE except debts secured by liens on property sold subject thereto, and with respect to which there is no personal liability on the part of any of the Joint Venturers; and

  (iv) expenses of liquidation;

(b) then to the setting up of any reserves which the liquidating Joint Venturers may deem necessary for any contingent or unforeseen liabilities or obligations of the JOINT VENTURE. Said reserves may be paid over by the JOINT VENTURE to a bank or trust company acceptable to the liquidating Joint Venturers, as escrowee, to be held by it for the purpose of disbursing such reserves in payment of any of the aforementioned liabilities or obligations, and at the expiration of such period as the

(c) liquidating Joint Venturers shall deem advisable, distributing the balance, if any, thereafter remaining, in the manner hereinafter provided;

(d) then to and among the Joint Venturers in proportion to the balances in their respective capital accounts; and

(e) then to and among the Joint Venturers in proportion to their respective interests in the JOINT VENTURE.

## Section 11.5 - Orderly Liquidation

A reasonable time shall be allowed for the orderly liquidation of the assets of the JOINT VENTURE and the discharge or liabilities to creditors so as to enable the Joint Venturers to minimize the losses normally attendant upon a liquidation.

## ARTICLE XII
## GENERAL

## Section 12.1 - Notices

All notices, demands or requests required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly received when delivered personally and receipted for on the second (2d) day after being deposited in the U.S. registered or certified mail, postage prepaid, return receipt requested and addressed as herein set forth. Any notice mailed to any Joint Venturer shall be directed to the Joint Venturer at such address set forth below, or to such other address as may be designated by the Joint Venturer by providing the Chairman with notice of the change of address as herein provided.

12

## Section 12.2 - Governing Law

This Agreement and the obligations of the Joint Venturers hereunder shall be interpreted, construed and enforced under the laws of the State of Illinois.

## Section 12.3 - Entire Agreement

This Agreement contains the entire agreement between the parties hereto relative to the matters addressed herein. No variations, amendment, modifications or changes of this Agreement shall be binding upon any party unless set forth in a document duly executed by or on behalf of such party and approved and accepted by the JOINT VENTURE pursuant to Section 9.1.

## Section 12.4 - Further Assurances

Each of the parties hereto shall from time to time and at all times do all such other and further acts as may be reasonably necessary in order to fully perform and carry out the terms and intent hereof.

## Section 12.5 - Admission of Additional Joint Venturers

No additional Joint Venturers may be admitted to the JOINT VENTURE except as provided herein or by the unanimous consent of the Joint Venturers and upon such terms and conditions as agreed upon by the Joint Venturers.

## Section 12.6 - Severability

If any provision of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of the Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the extent permitted by law.

## Section 12.7 - Binding Effect

This Agreement shall inure to the benefit of and be binding upon the undersigned Joint Venturers and, subject to the restrictions on transfers and other dispositions set forth herein, their respective successors and assigns.

## Section 12.8 - Indemnification; Survival of Obligations

(a)      Each Joint Venturer agrees to indemnify and hold harmless each other Joint Venturer from and against any and all costs, expenses or losses, including reasonable attorney's fee, which such other Partners may suffer as a result of any action taken by

13

the indemnifying Joint Venturer which is outside the scope of the authority granted by this Agreement or as a result of any breach of this Agreement by the indemnifying Joint Venturer.

(b)    The obligations of each Joint Venturer under this Section 12.8 shall survive and be enforceable against them notwithstanding the dissolution of the JOINT VENTURE.

## Section 12.9 - Counterparts

This Agreement may be signed in counterparts, and the signed counterparts, when taken together, will be considered as one fully executed agreement.

**IN WITNESS HEREOF**, the Joint Venturers, and each of them, have signed this Operating Agreement on this ___ day of ___ 2005.

_____
John J. O'Leary

_____
Jack O'Leary

_____
John Mulhern

_____
Marlene Mulhern

_____
Renee Norgle O'Leary

_____

Prepared by John J. O'Leary for a fee of $150.00 to be paid out of the proceeds.

14

# INSTALLMENT NOTE

July ___ ___ 2005

$80,000.00                                       Hinsdale, Illinois

FOR VALUE RECEIVED, WE promise to pay to John and Renee O'Leary and Jack O'Leary the principal sum of $80,000.00 with interest thereon until the maturity hereof at the rate of 5 per cent per annum starting on the nineteenth day of August, 2005 and on the nineteenth day of each month thereafter unit said note is fully paid except that the final payment of principal and interest, if not sooner paid, shall be due on the nineteenth day of January, 2007. All such payments on account of the indebtedness evidenced by this Note shall be first applied to interest on the unpaid principal; provided that each installment unless paid when due shall result in liquidated damages of Five (5%) per cent of the Total Monthly Payment. This requirement of payment may be foreborne by lender without waiving any of lender's other rights or rights to enforce this document.

The said payments of both principal and interest are to be paid at 120. South State Street, Chicago, Il or such address as the legal holder of this note, from time to time, may appoint.

The payment of this note is secured by mortgage, bearing even date herewith, to John and Renee O'Leary and Jack O'Leary on real estate in the COUNTY OF DuPage, 341 E. Chicago, Hinsdale, Illinois; and it is agreed that in case of default for twenty days in the payment of any installment of interest on this note or in the performance of any other agreement contained in said mortgage, then, at the election of the legal holder hereof (which election may be made at any time after the expiration of said three days, without notice), the principal sum hereof, together with accrued interest thereon, shall become at once due and payable at the place of payment aforesaid.

All parties hereto severally waive presentment for payment, notice of dishonor, protest and notice of protest.

This note will be cancelled and not enforced upon the sale of 341 E. Chicago, Hinsdale, Illinois and Compliance with the 341 E. Chicago Joint Venture Agreement. Borrower may not enforce the terms of this agreement in place of the 341 E. Chicago Joint Venture Agreement dated July 19, 2005.

EXHIBIT

B

tabbies

**SECOND MORTGAGE**

(Illinois)

THIS INDENTURE, made July 18th, 2005, between John and Marlene Mulhern, husband and wife, whose address is 232 Maplewood Rd Riverside IL 60546.

**FRED BUCHOLZ**
**DUPAGE COUNTY RECORDER**
OCT.20,2006          RHSP     3:12 PM
OTHER                09−01−420−010
**009 PAGES      R2006−204660**

(Above Space For Recorder's Use Only)

herein collectively referred to as "Mortgagor," and John and Renee O'Leary of Chicago, Illinois and Jack O'Leary of River Forest, Illinois , herein referred to as "Mortgagee,"

## W I T N E S S E T H:

THAT WHEREAS, Mortgagor is justly indebted to Mortgagee upon that certain Note dated July __, 2005 in the principal sum of Eighty Thousand and No/100 Dollars ($80,000), payable to the order of and delivered to Mortgagee (the "Note"), in and by which Note Mortgagor promises to pay the principal sum set forth in the Note (Installment note dated July 19, 2005 and attached as an Exhibit). Interest rate is 5%. Due date is July 10, 2007 for balloon payment.

NOW, THEREFORE, Mortgagor to secure the payment of the said principal sum of money and additional sums in accordance with the terms, provisions and limitations of this Mortgage, and the performance of the covenants and agreements herein contained, by Mortgagor to be performed, and also in consideration of the sum of Ten Dollars in hand paid, the receipt whereof is hereby acknowledged, does by these presents CONVEY AND WARRANT unto Mortgagee, and Mortgagee's successors and assigns, the real estate and all of Mortgagor's estate, right, title and interest therein, situate, lying and being in the Town of Hinsdale, County of DuPage and State of Illinois, legally described in Exhibit A attached hereto, which, with the property hereinafter, described, is referred to herein as the "premises."

TOGETHER with all improvements, tenements, easements, fixtures and appurtenances thereto belonging, and all leases, rents, issues and profits thereof and all of Mortgagor's rights in and to any insurance proceeds or in condemnation awards for so long and during all such times as Mortgagor may be entitled thereto (which are pledged primarily and on a parity with said real estate and not secondarily) and all apparatus, equipment or articles now or hereafter therein or thereon used to supply heat, gas, air conditioning, water, light, power, refrigeration (whether single units or centrally controlled), and ventilation, including (without restricting the foregoing), screens, window shades, storm doors and windows, floor coverings, awnings, stoves and water heaters. All of the foregoing are declared to be a part of said real estate whether physically attached thereto or not, and it is agreed that all similar apparatus, equipment or articles hereafter placed in the premises by Mortgagor or Mortgagor's respective heirs, executors, personal representatives, successors or assigns shall be considered as constituting part of the real estate.

CH01/ 12430892.1

**EXHIBIT**
C

TO HAVE AND TO HOLD the premises unto Mortgagee, and Mortgagee's successors and assigns, forever, for the purposes, and upon the uses herein set forth, free from all rights and benefits under and by virtue of the Homestead Exemption Laws of the State of Illinois, which said rights and benefits Mortgagor does hereby expressly release and waive.

**The following covenants, conditions and provisions are a part hereof and shall be binding on Mortgagor and Mortgagor's respective heirs, executors, personal representatives, successors and assigns.**

1. Mortgagor shall (a) promptly repair, restore or rebuild any buildings or improvements now or hereafter on the premises which may become damaged or be destroyed; (b) keep the premises in good condition and repair, without waste, and free from mechanics' or other liens or claims for lien not expressly subordinated to the lien thereof; (c) pay when due any indebtedness which may be secured by a lien or charge on the premises superior to the lien hereof, and upon request exhibit satisfactory evidence of the discharge of such prior lien to Mortgagee; (d) complete within a reasonable time any building or buildings now or at any time in process of erection upon said premises; (e) comply with all requirements of law or municipal ordinances with respect to the premises and the use thereof; and (f) make no material alterations in the premises except as required by law or municipal ordinance without the prior written consent of Mortgagee.

2. Mortgagor shall pay before any penalty attaches all general taxes, and shall pay special taxes, special assessments, water charges, sewer service charges, and other charges against the premises when due, and shall, upon written request, furnish to Mortgagee duplicate receipts therefor. To prevent default hereunder, Mortgagor shall pay in full under protest, in the manner provided by statute, any tax or assessment which Mortgagor may desire to contest.

3. In the event of the enactment after this date of any law of Illinois deducting from the value of land for the purpose of taxation any lien thereon, or imposing upon Mortgagee the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Mortgagor, or changing in any way the laws relating to the taxation of mortgages or debts secured by mortgages or the mortgagee's interest in the property, or the manner of collection of taxes, so as to affect this Mortgage or the debt secured hereby or the holder thereof, then and in any such event, Mortgagor, upon demand by Mortgagee, shall pay such taxes or assessments, or reimburse Mortgagee therefor; provided, however, that if in the opinion of counsel for Mortgagee (a) it might be unlawful to require Mortgagor to make such payment, or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, Mortgagee may elect, by notice in writing given to Mortgagor, to declare all of the indebtedness secured hereby to be and become due and payable ninety (90) days from the giving of such notice.

4. If, by the laws of the United States of America or of any state having jurisdiction in the premises, any tax is due or becomes due in respect to the issuance of the Note hereby secured, Mortgagor covenants and agrees to pay such tax in the manner required by any such law. Mortgagor further covenants to hold harmless and agrees to indemnify Mortgagee, and Mortgagee's successors or assigns, against any liability incurred by reason of the imposition of any tax on the issuance of the Note secured hereby.

5.    Mortgagor shall keep all buildings and improvements now or hereafter situated on the premises insured against loss or damage by fire, lightning and windstorm under policies providing for payment by the insurance companies of moneys sufficient either to pay the cost of replacing or repairing the same or to pay in full the indebtedness secured hereby and to pay in full all prior liens and encumbrances, all in companies satisfactory to Mortgagee, under insurance policies payable, in case of loss or damage, to Mortgagee, such rights to be evidenced by the standard mortgage clause to be attached to each policy, and shall deliver all policies, including additional and renewal policies, to Mortgagee, and in case of insurance about to expire, shall deliver renewal policies not less than ten days prior to the respective dates of expiration.

6.    In case of default therein, Mortgagee may, but need not, make any payment or perform any act hereinbefore required of Mortgagor in any form and manner deemed expedient, and may, but need not, make full or partial payments of principal or interest on prior encumbrances, if any, and purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting the premises or contest any tax or assessment. All moneys paid for any of the purposes herein authorized and all expenses paid or incurred in connection therewith, including attorneys' fees, and any other moneys advanced by Mortgagee to protect the premises and the lien hereof, shall be so much additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon at the "Default Rate" as defined in the Note. Inaction of Mortgagee shall never be considered as a waiver of any right accruing to Mortgagee on account of any default hereunder on the part of Mortgagor.

7.    Mortgagee making any payment hereby authorized relating to taxes or assessments, may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

8.    Mortgagor shall pay each item of indebtedness herein mentioned, when due according to the terms hereof and of the Note. At the option of Mortgagee and without notice to Mortgagor, all unpaid indebtedness secured by this Mortgage shall, notwithstanding anything in the Note or in this Mortgage to the contrary, become due and payable upon the occurrence of any one of the following, each of which shall be an "Event of Default":

(a)    immediately upon the occurrence of an Event of Default under the Note; or

(b)    when default shall occur and continue for thirty days after written notice in the performance of any other agreement of Mortgagor herein contained; or

(c)    if the holder of any lien or security interest on the premises, other than Mortgagee (whether or not Mortgagee has consented to the existence of such lien or security interest) institutes or completes foreclosure or other proceedings for the enforcement of its remedies with respect to such lien or security interest; or

(d)    if Mortgagor fails to remove, cancel or release any lis pendens, abstract of judgment, unrecorded judgment, or claim of lien or security interest against

Mortgagor, or the premises except for the first Mortgage in favor of _Countrywide_____(the "First Mortgage"); or

(e)  if any claim of priority to this Mortgage by title, lien, security interest or otherwise, except with regard to the First Mortgage, is asserted in any legal or equitable proceedings; or

(f)  if any execution, attachment, sequestration or other writ is levied against the premises or any part thereof or against the assets of Mortgagor and is not discharged within 30 days after filing; or

(g)  if Mortgagor abandons all or any portion of the premises; or

(h)  if Mortgagor fails to pay any money judgment against it at least ten days prior to the date on which any of the assets of Mortgagor may be lawfully sold to satisfy such judgment; or

(i)  if Mortgagor shall become insolvent, fail to pay its debts generally as they become due, voluntarily seek, consent to or acquiesce in the benefit or benefits of any "Debtor Relief Law" (hereinafter defined), or become a party to (or be made the subject of) any proceeding provided for by any Debtor Relief Law, other than as a creditor or claimant, that could suspend or otherwise adversely affect the rights of Mortgagee granted herein (unless, in the event such proceeding is involuntary, the petition instituting same is dismissed within 60 days of the filing of same).  As used herein "Debtor Relief Law" means the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

9.  When the indebtedness hereby secured shall become due, whether by acceleration or otherwise, Mortgagee shall have the right to foreclose the lien hereof.  In any suit to foreclose the lien hereof, there shall be allowed and included as additional indebtedness in the decree for sale all expenditures and expenses which may be paid or incurred by or on behalf of Mortgagee for attorneys' fees, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches, and examinations, title insurance policies, and similar data and assurances with respect to title as Mortgagee may deem to be reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of the premises.  All expenditures and expenses of the nature in this paragraph mentioned shall become so much additional indebtedness secured hereby and immediately due and payable, with interest thereon at the Default Rate, when paid or incurred by Mortgagee in connection with (a) any proceeding, including probate and bankruptcy proceedings, to which Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this Mortgage or any indebtedness hereby secured; or (b) preparations for the commencement of any suit of the foreclosure hereof after accrual of such right to foreclose whether or not actually commenced; or (c) preparations for the

defense of any actual or threatened suit or proceeding which might affect the premises or the security hereof.

10.    The proceeds of any foreclosure sale of the premises shall be distributed and applied in the following order of priority: First, on account of all costs and expenses incident to the foreclosure proceedings, including all such items as are mentioned in the preceding paragraph hereof; second, all other items which under the terms hereof constitute secured indebtedness additional to that evidenced by the Note, with interest thereon as herein provided; third, all principal and interest remaining unpaid on the Note; fourth, any overplus to the person or entity then entitled thereto pursuant to applicable state law.

11.    Upon or at any time after the filing of a complaint to foreclose this Mortgage, the court in which such complaint is filed may appoint a receiver of the premises. Such appointment may be made either before or after sale, without notice, without regard to the solvency or insolvency of Mortgagor at the time of application for such receiver and without regard to the then value of the premises or whether the same shall be then occupied as a homestead or not, and Mortgagee may be appointed as such receiver. Such receiver shall have power to collect the rents, issues and profits of the premises during the pendency of such foreclosure suit and, in case of a sale and a deficiency, during the full statutory period of redemption, whether there be redemption or not, as well as during any further times when Mortgagor, except for the intervention of such receiver, would be entitled to collect such rents, issues and profits and all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the premises during the whole of said period. The court from time to time may authorize the receiver to apply the net income in his hands in payment in whole or in part of:  (a) the indebtedness secured hereby, or by any decree foreclosing this Mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale; and (b) the deficiency in case of a sale and deficiency.

12.    Mortgagee is hereby authorized and empowered to exercise any right available under this instrument, at law and in equity, including, but not limited to, the right, if any to the extent permitted by law, to sell or cause to be sold at public auction the premises and to convey the same by the execution and delivery to the purchaser at such sale of good and sufficient deeds of conveyance in law, pursuant to the statute in such case made and provided.

13.    In order to facilitate Mortgagee's exercise of the rights, powers and remedies granted above, Mortgagor hereby irrevocably appoints Mortgagee its true and lawful attorney to act in its name and stead for the purpose of effectuating any sale, assignment, transfer or delivery authorized above, whether pursuant to foreclosure or otherwise, and to execute and deliver all such deeds, bills of sale, leases, assignments and other instruments as Mortgagee may deem necessary and appropriate. Notwithstanding the foregoing, if requested by Mortgagee or any purchaser from Mortgagee, Mortgagor shall ratify and confirm any such sale, assignment, transfer or delivery by executing and delivering to Mortgagee or such purchaser all appropriate deeds, bills of sale, lease assignments and other instruments as may be designated in such request. Further, Mortgagor agrees that Mortgagee may be a purchaser of the premises or any part thereof or any interest therein at any sale, whether pursuant to foreclosure or otherwise, and may apply upon the purchase price the indebtedness secured hereby. Any purchaser at any sale

shall acquire good title to the property so purchased, free of the lien of this Mortgage and free of all rights of redemption in Mortgagor. The receipt of the officer making the sale under judicial proceedings or of Mortgagee shall be sufficient discharge to the purchaser for the purchase money and such purchaser shall not be responsible for the proper application thereof.

14. Mortgagor hereby waives the benefit of all appraisement, valuation, stay, extension, exemption or redemption laws or any so-called "Moratorium Laws" now existing or hereafter enacted. Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the premises marshalled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the premises sold as an entirety. Mortgagor hereby waives any and all rights of the redemption from sale to which it may be entitled under the laws of the in which the premises are located, on behalf of Mortgagor and each and every person acquiring any interest in, or title to, the premises described herein subsequent to the date of this Mortgage, and on behalf of all other persons to the extent permitted by law.

15. Each right, power and remedy of Mortgagee now or hereafter existing at law or in equity shall be cumulative and concurrent and shall be in addition to every right, power and remedy provided for in this Mortgage, and the exercise of any right, power or remedy shall not preclude the simultaneous or later exercise of any other right, power or remedy. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Mortgagee.

16. Any action, suit or proceeding brought by Mortgagee pursuant to this Mortgage, or otherwise, and any claim made by Mortgagee under this Mortgage, or otherwise, may be compromised, withdrawn or otherwise dealt with by Mortgagee without any notice to or approval of Mortgagor, except as otherwise provided in this Mortgage.

17. No delay or failure by Mortgagee to insist upon the strict performance of any term hereof or of the Note or to exercise any right, power or remedy provided for herein or therein as a consequence of an Event of Default hereunder or thereunder, and no acceptance of any payment of the principal or interest on the Note during the continuance of any such Event of Default, shall constitute a waiver of any such term, such Event of Default or such right, power or remedy, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver of any Event of Default hereunder shall affect or alter this Mortgage, which shall continue in full force and effect with respect to any other then existing or subsequent Events of Default. Mortgagee shall be entitled to enforce payment and performance of any indebtedness or obligations secured hereby and to exercise all rights and powers under this Mortgage or other agreement or any laws now or hereafter in force, notwithstanding some or all of such indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, trust deed, pledge, lien, assignment or otherwise. Neither the acceptance of this Mortgage nor its enforcement, whether by court action or by other powers herein contained, shall prejudice or in any manner affect Mortgagee's right to realize upon or enforce any other security now or hereafter held by Mortgagee.

18.    No action for the enforcement of the lien or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing same in an action at law upon the Note hereby secured.

19.    Mortgagee shall have the right to inspect the premises at all reasonable times and access thereto shall be permitted for that purpose.

20.    If the payment of said indebtedness or any part thereof be extended or varied or if any part of the security be released, all persons now or at any time hereafter liable therefor, or interested in said premises, shall be held to assent to such extension, variation or release, and their liability and the lien and all provisions hereof shall continue in full force, the right of recourse against all such persons being expressly reserved by Mortgagee, notwithstanding such extension, variation or release.

21.    Any notice, demand or other communication given pursuant to the terms hereof shall be in writing, addressed as follows:

If to Mortgagor: _John Mulhern_
_282 Maplewood Rd_
_Riverside, IL 60546_

If to Mortgagee: _John O'Leary   120 S. 5th T._
_Chicago, IL 60603_

and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or if sent by certified or registered mail, postage prepaid, return receipt requested, shall be deemed to have been duly given or made on the date of the return receipt, if accepted, or on the date rejected or returned, if not accepted; provided, however, that Mortgagor or Mortgagee may change their respective addresses for purposes of receipt of notices by giving ten days' written notice of such change to the other party in the manner above prescribed.

22.    Mortgagee shall release this Mortgage and lien hereof by proper instrument upon payment and discharge of all indebtedness secured hereby.

23.    This Mortgage and all provisions hereof, shall extend to and be binding upon Mortgagor and all persons claiming under or through Mortgagor, and the word "Mortgagor" when used herein shall include all such persons and all persons liable for the payment of the indebtedness or any part thereof, whether or not such persons shall have executed the Note or this Mortgage. The word "Mortgagee" when used herein shall include the successors and assigns of Mortgagee named herein and the holder or holders, from time to time, of the Note secured hereby.

24. In the event Mortgagor shall sell, convey, transfer, dispose of or further encumber the premises or any part thereof, or any interest therein, or agree to do so, without the prior

LEGAL DESCRIPTION - EXHIBIT A

Legal Description: THE WEST FIFTY (50) FEET OF THE EAST ONE HUNDRED TEN (110) FEET OF THAT PART OF BLOCK TEN (10), (LYING WEST OF OAK STREET) AND OF A TRACT OF LAND TEN (10) FEET IN WIDTH LYING IMMEDIATELY SOUTH OF AND ADJOINING SAID PART OF BLOCK TEN (10) OF WALKER'S ADDITION TO THE TOWN OF HINSDALE, BEING THAT PORTION OF SAID BLOCK TEN (10) AND SAID TEN (10) FOOT TRACT, BOUNDED AS FOLLOWS: COMMENCING AT THE NORTH WEST CORNER OF CHICAGO AVENUE AS NOW LOCATED AND OAK STREET IN SAID VILLAGE OF HINSDALE; THENCE RUNNING IN A WESTERLY DIRECTION ALONG THE NORTH LINE OF CHICAGO AVENUE AS NOW LOCATED ONE HUNDRED TEN (110) FEET FOR A PLACE OF BEGINNING; THENCE RUNNING NORTH PARALLEL TO THE WEST LINE OF OAK STREET TO THE SOUTH LINE OF THE RIGHT OF WAY OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD; THENCE IN A NORTH EASTERLY DIRECTION ALONG THE SOUTH LINE OF SAID RIGHT OF WAY TO A POINT LOCATED SIXTY (60) FEET WEST OF THE WEST LINE OF OAK STREET (MEASURED AT RIGHT ANGLES WITH THE WEST LINE OF OAK STREET); THENCE SOUTH PARALLEL TO THE WEST LINE OF OAK STREET TO NORTH LINE OF CHICAGO AVENUE AS NOW LOCATED; THENCE WEST FIFTY (50) FEET TO THE PLACE OF BEGINNING; SAID BLOCK TEN (10) BEING SITUATED UPON AND A PART OF THE SOUTH EAST QUARTER OF SECTION ONE (1), TOWNSHIP THIRTY-EIGHT (38) NORTH, RANGE ELEVEN (11), EAST OF THE THIRD PRINCIPAL MERIDIAN, IN DU PAGE COUNTY, ILLINOIS.

Permanent Index #'s: 09-01-420-010

Property Address: 341 East Chicago Avenue, Hinsdale, Illinois 60521

written consent of Mortgagee, then, at Mortgagee's option, all unpaid principal under the Note secured by this Mortgage shall become immediately due and payable.

    25.  This mortgage may be cancelled by mortgagees upon compliance by mortgagor with 341 E. Chicago Joint Venture Agreement dated July ___, 2005.

    Witness the hands of Mortgagor the day and year first above written.

_____ Mortgagee

This Document was prepared by John J. O'Leary
120 S. State,
Suite 200
Chicago, IL 60603

Mail recorded Document to ( John J. O'Leary
1252 N. Damen
Chicago, IL
60622

LEGAL DESCRIPTION - EXHIBIT A

Legal Description: THE WEST FIFTY (50) FEET OF THE EAST ONE HUNDRED TEN (110) FEET OF THAT PART OF BLOCK TEN (10), (LYING WEST OF OAK STREET) AND OF A TRACT OF LAND TEN (10) FEET IN WIDTH LYING IMMEDIATELY SOUTH OF AND ADJOINING SAID PART OF BLOCK TEN (10) OF WALKER'S ADDITION TO THE TOWN OF HINSDALE, BEING THAT PORTION OF SAID BLOCK TEN (10) AND SAID TEN (10) FOOT TRACT, BOUNDED AS FOLLOWS: COMMENCING AT THE NORTH WEST CORNER OF CHICAGO AVENUE AS NOW LOCATED AND OAK STREET IN SAID VILLAGE OF HINSDALE; THENCE RUNNING IN A WESTERLY DIRECTION ALONG THE NORTH LINE OF CHICAGO AVENUE AS NOW LOCATED ONE HUNDRED TEN (110) FEET FOR A PLACE OF BEGINNING; THENCE RUNNING NORTH PARALLEL TO THE WEST LINE OF OAK STREET TO THE SOUTH LINE OF THE RIGHT OF WAY OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD; THENCE IN A NORTH EASTERLY DIRECTION ALONG THE SOUTH LINE OF SAID RIGHT OF WAY TO A POINT LOCATED SIXTY (60) FEET WEST OF THE WEST LINE OF OAK STREET (MEASURED AT RIGHT ANGLES WITH THE WEST LINE OF OAK STREET); THENCE SOUTH PARALLEL TO THE WEST LINE OF OAK STREET TO NORTH LINE OF CHICAGO AVENUE AS NOW LOCATED; THENCE WEST FIFTY (50) FEET TO THE PLACE OF BEGINNING; SAID BLOCK TEN (10) BEING SITUATED UPON AND A PART OF THE SOUTH EAST QUARTER OF SECTION ONE (1), TOWNSHIP THIRTY-EIGHT (38) NORTH, RANGE ELEVEN (11), EAST OF THE THIRD PRINCIPAL MERIDIAN, IN DU PAGE COUNTY, ILLINOIS.

Permanent Index #'s: 09-01-420-010

Property Address: 341 East Chicago Avenue, Hinsdale, Illinois 60521

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| John, Jack, and Renee O'Leary | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | No. 05 M4 206 |
| | ) | (transferred to Chancery) |
| | ) | |
| John and Marlene Mulhern | ) | |
| | ) | |
| Defendants, | ) | |

To:   Daniel Sherman
      2153 Ransom Road
      Valparaiso, IN 46385

### Notice of Filing

PLEASE TAKE NOTICE that on September 7, 2007, the undersigned caused to be filed with the office of the Clerk of the Circuit Court of Cook County, the following: Amended Complaint, Answer to Affirmative Defenses, and Answer to Counterclaim.

By: _____

LAW OFFICES OF THOMAS A MORRISSEY
102 W. Burlington Ave., Suite 1
La Grange, Illinois 60525
(708) 352 3790
Attorney No. 17001

### CERTIFICATE OF SERVICE

The undersigned, upon oath, states that the foregoing Notice of Filing was served upon the parties stated above by placing copy of same in a properly addressed and stamped envelope, with postage prepaid, and depositing same in the US Mail at the post office at La Grange, Illinois on September 7, 2007.

_____

# EXHIBIT 2

## IN THE CIRCUIT COURT OF COOK COUNTY
## MUNICIPAL DEPARTMENT – 4TH DISTRICT

JOHN J. O'LEARY, RENEE O'LEARY,  )
and JACK O'LEARY,  )
        Plaintiffs,  )
        v.  )     Case No. 07 M4 206
JOHN MULHERN and MARLENE MULHERN,  )
        Defendants.  )

---

JOHN MULHERN and MARLENE MULHERN,  )
        Counter-Plaintiffs,  )
        v.  )
JOHN J. O'LEARY, RENEE O'LEARY, and  )
JACK O'LEARY,  )
        Counter-Defendants.  )

### ANSWER TO COMPLAINT FOR BREACH OF CONTRACT,
### AFFIRMATIVE DEFENSES AND COUNTERCLAIM

### ANSWER

Defendants, John Mulhern and Marlene Mulhern, by their attorney, Daniel W. Sherman, answer plaintiff's Complaint for Breach of Contract, as follows:

1. Paragraph 1 states a legal conclusion to which no response is required.

2. Defendants state that Exhibit "A" attached to plaintiff's Complaint speaks for itself. To the extent that paragraph 2 may be construed to allege any factual matters, defendants deny same.

3. Defendants deny the allegations of paragraph 3.

4. Defendants deny the allegations of paragraph 4.

5. Defendants admit that plaintiff's made certain payments toward the mortgage held on the subject property (341 E. Chicago, Hinsdale, IL), but lack knowledge as to the specific amount.

WHEREFORE, defendants further deny the damages asserted by plaintiffs, and request that this Court dismiss plaintiff's Complaint with prejudice, and award defendants their costs.

1

## AFFIRMATIVE DEFENSES

1.  Plaintiffs have breached the Operating Agreement for the subject property, which is attached hereto as Exhibit "A," thus excusing defendants from any performance allegedly due under the Installment Note.

2.  Marlene Mulhern never signed the Promissory Note, and thus it should be unenforceable against her.

3.  The Installment Note on its face states that it will be cancelled upon the sale of the subject property, which is currently being marketed to accomplish a sale.

4.  The Installment Note is subject to the Operating Agreement, which states that capital contributions shall not bear interest. See Exhibit "A", at Section 6.2.

5.  Plaintiffs have demonstrated a lack of good faith and fair dealing with defendants, which is an inherent part of any Illinois contract, including the Installment Note.

6.  Plaintiffs have failed to mitigate their damages.

7.  Plaintiffs pray for relief including attorneys' fees, but neither the Installment Note nor Illinois law provides for such relief.

WHEREFORE, defendants request that this Court dismiss plaintiff's Complaint with prejudice, and award defendants their costs.

JOHN MULHERN AND MARLENE MULHERN

By:    Daniel W. Sherman

#33660
Daniel W. Sherman, Attorney At Law
2153 Ransom Road
Valparaiso, IN  46385
219.462.9957

2

## COUNTERCLAIM

Counter-Plaintiffs, John Mulhern and Marlene Mulhern, by their attorney, Daniel W.
Sherman, hereby Counterclaim against Counter-Defendants John J. O'Leary, Renee O'Leary and
Jack O'Leary, as follows:

1.      In June or July 2005, John and Marlene Mulhern retained Counter-defendant John
J. O'Leary to represent them for the purchase property located at 341 E. Chicago in
Hinsdale, Illinois (the "subject property").

2.      In July 2005, Counter-Plaintiff John Mulhern and Counter-Defendants agreed to
invest together in a joint venture to purchase the subject property.

3.      In agreeing to invest together for the subject property, the Joint Venturers decided
that John Mulhern and Marlene Mulhern should hold title.

4.      To memorialize the Joint Venturers' agreement, John J. O'Leary drafted an
Operating Agreement for 341 E. Chicago Joint Venture.  A copy of the Operating
Agreement is attached hereto as Exhibit "A".

5.      The Operating Agreement provides in Article VI for Capital Contributions by the
Joint Venturers.

6.      In addition to Initial Capital Contributions, which are described in Section 6.1 and
further specified in Section 7.2, the Operating Agreement contemplated that the Joint
Venturers would make Additional Capital Contributions, as provided in Section 6.2.

### COUNT I – BREACH OF THE OPERATING AGREEMENT
#### (As to John J. O'Leary, Renee O'Leary and Jack O'Leary)

7.      The Joint Venturers entered into a binding agreement by signing the Operating
Agreement on July 19, 2005.

3

8.     By its terms, the Operating Agreement explicitly provided that each Joint Venturer would be responsible for Additional Capital Contributions.

9.     In addition, in Illinois, any contract implicitly requires that a contracting party act in good faith and fair dealing with other parties to the contract.

11.     Counter-Defendants John J. O'Leary, Renee O'Leary and Jack O'Leary have breached the Operating Agreement by refusing to cooperate with John Mulhern, and refusing to discuss with him making Additional Capital Contributions as provided in Section 6.2.

12.     Counter-Defendants failure to abide by the terms of the Operating Agreement, specifically, to cooperate with John Mulhern or discuss making Additional Capital Contributions, has proximately caused damages to Counter-Plaintiffs in that they have been making mortgage payments on the subject property without any assistance from Counter-Defendants.

WHEREFORE, Counter-Plaintiffs pray that this Court enter judgment in their favor against Counter-Defendants and award damages for their breaching the Operating Agreement and for any further relief deemed appropriate, including awarding Counter-Plaintiffs their costs.

## COUNT II – DECLARATORY JUDGMENT
### (As to John J. O'Leary, Renee O'Leary and Jack O'Leary)

13.     With regard to Exhibit "A" attached hereto (the Operating Agreement) and Exhibit "A" attached to Plaintiff's Complaint (the Installment Note) attached to Plaintiff's Complaint, Plaintiffs/Counter-Defendants and Defendants/Counter-Plaintiffs have differing relationships depending on which document controls.

14.     More specifically, Plaintiffs/Counter-Defendants seek, by virtue of the Installment Note dated July 19, 2005, to enforce an $80,000 "loan" purportedly made by

4

06/13/2007  10:22    77    47126    JOHN J OLEARY    PAGE  07/18

Plaintiffs/Counter-Defendants to Defendants/Counter-Plaintiffs, which allegedly is to bear interest at 5% until paid.  See Exhibit "A" to underlying Complaint.

15.    Meanwhile, also on July 19, 2005, Plaintiffs/Counter-Defendants entered into a Joint Venture with John Mulhern, the business of which was generally outlined in the Operating Agreement (Exhibit "A" attached hereto).  In the Operating Agreement, the $80,000 (characterized as a loan in the Installment Note) is listed as a capital contribution, with $60,000 attributed to John O'Leary and Renee O'Leary, and $20,000 attributed to Jack O'Leary.  *Id.* at Section 7.2

16.    The Operating Agreement also lists John Mulhern and Marlene Mulhern's capital contribution as $80,000.  *Id.*

17.    The Operating Agreement further provides that net profits and net losses shall be divided equally between the Mulherns and the O'Learys.  *Id.* at Section 8.1.

18.    Further, the Operating Agreement provides for not only the initial capital contributions listed above, but additional capital contributions.  *Id.* at Section 6.1 and 6.2.

19.    The Operating Agreement states that "[c]apital contributions shall not bear interest.  *Id.* at Section 6.2.

20.    Finally, the Installment Note states that "[t]his note will be cancelled and not enforced upon the sale of 341 E. Chicago, Hinsdale, Illinois and Compliance with the 341 E. Chicago Joint Venture Agreement."  See Exhibit "A" to Plaintiff's Complaint.

21.    Counter-Plaintiff/Defendant John Mulhern is actively marketing the subject property for sale.

22.    By virtue of the conflicting and contradictory terms of the Installment Note and Operating Agreement, both of which Plaintiff/Counter-Defendant John O'Leary drafted; there is an actual controversy between the parties in this case.

5

WHEREFORE, Counter-Plaintiffs pray for a judicial declaration determining the rights of the parties vis-à-vis both the Operating Agreement and Installment Note.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (As to John J. O'Leary Only)

23.    Once retained as Counter-Plaintiffs' attorney for purchasing the subject property, John J. O'Leary owed John Mulhern and Marlene Mulhern a fiduciary duty to exercise the utmost competence, skill and loyalty in furthering their interests.

24.    Instead of furthering Counter-Plaintiffs' interests with the utmost competence, skill and loyalty, John J. O'Leary drafted two documents in which he had an adverse interest to Counter-Plaintiffs:  1) the Operating Agreement (Exhibit "A" hereto); and 2) the Installment Note (Exhibit "A" to the Complaint filed against John Mulhern and Marlene Mulhern).

25.    John J. O'Leary never advised Counter-Plaintiffs that his fiduciary role in representing them to purchase the subject property was adverse to his role as Joint Venturer/Investor in the Operating Agreement and as purported "lender" under the Installment Note.

26.    John J. O'Leary breached his duty to Counter-Plaintiffs in one or more of the following ways:

   a.  Drafted the Operating Agreement and requested John Mulhern to sign same without advising Counter-Plaintiffs that his role as their attorney was adverse to his role as fellow Joint Venturer under the Operating Agreement;

   b.  Drafted the Installment Note without advising Counter-Plaintiffs that his role as their attorney was adverse to his role as purported "lender" under the Installment Note;

6

c.  Requested that John Mulhern sign the Installment Note, thus intending to bind John to contractual duties, without advising him that John J. O'Leary's role as attorney was adverse to his role as purported "lender" under the Installment Note.

d.  Requested that John Mulhern sign his wife, Marlene Mulhern's, name to the Installment Note without her permission.

e.  Drafted the Operating Agreement without presenting it to Marlene Mulhern for her signature.

f.  Failed to advise Counter-Plaintiffs of the inherent conflict of interests involved with John J. O'Leary representing Counter-Plaintiffs as their attorney for purchasing the subject property, while also serving as a Joint Venturer under the Operating Agreement, and purported "lender" under the Installment Note.

g.  Filed suit against Counter-Plaintiffs, as a party *and attorney*, for alleged breach of the Installment Note, when the Illinois Rules of Professional Conduct prevent him from doing so.

27.    John J. O'Leary's breach of his fiduciary duty to Counter-Plaintiffs has proximately caused them damages in that O'Leary has thwarted Counter-Plaintiffs' ability to sell the subject property, and required them to defend the underlying lawsuit filed against them for alleged breach of the Installment Note, including hiring counsel to represent them in that suit.

WHEREFORE, Counter-Plaintiffs pray that this Court enter judgment in their favor against Counter-Defendant John J. O'Leary, award damages for breaching his fiduciary duty to

7

them, and for any further relief deemed appropriate, including awarding Counter-Plaintiffs their

costs.

JOHN MULHERN AND MARLENE MULHERN


By:    Daniel W. Sherman

#33660
Daniel W. Sherman, Attorney At Law
2153 Ransom Road
Valparaiso, IN  46385
219.462.9957

## PROOF OF SERVICE

Under penalties as provided in Section 1-109 of the Illinois Code of Civil Procedure, I

Daniel W. Sherman, an attorney, certify that on April _____, 2007, I served the **attached**

## ANSWER TO COMPLAINT FOR BREACH OF CONTRACT, AFFIRMATIVE

## DEFENSES AND COUNTERCLAIM by _____, to the following.

John J. O'Leary, Esq. (or his representative attorney)
1252 N. Damen Ave.
Chicago, IL  60622


Daniel W. Sherman, Attorney At Law

Atty. # 33660
Daniel W. Sherman, Attorney At Law
2153 Ransom Rd.
Valparaiso, IN  46385
219/462-9957

C:\Documents and Settings\Owner\My Documents\Client Docs\Mulhern\O'Leary\Pleadings\Ans.Counter.doc

8

1

# EXHIBIT 3

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT CHANCERY DIVISION

|  |  |
|---|---|
| JOHN O'LEARY, RENEE O'LEARY and JACK O'LEARY | ) ) ) |
| Plaintiff(s) | ) ) |
| -v- | ) No. 07 M 4206 ) (transferred to Chancery) |
| JOHN and MARLENE MULHERN | ) ) |
| Defendant(s). | ) ) |

### <u>ANSWER TO COUNTERCLAIM</u>

Plaintiffs/ Counter Defendants, John J. O'Leary, Renee O'Leary, and Jack O'Leary, by their attorneys, the Law Offices of Thomas A. Morrissey, and in response to the Counterclaim states as follows:

1.  Plaintiffs/Counter Defendants deny the allegations contained in paragraph one in the counterclaim.

2.  Plaintiffs/Counter Defendants admit only that certain of the plaintiffs agreed to invest together in joint venture to purchase the subject property.

3.  Plaintiffs/Counter Defendants deny allegations contain in paragraph three.

4.  Plaintiffs admit that Plaintiffs/Counter Defendant John O'Leary drafted the Operating Agreement and that a copy of said Operating agreement purports to be attached as Exhibit A to the counterclaim.

5.  Plaintiffs/Counter Defendants state that the operating agreement speaks for itself.  To the extent that paragraph five may be construed to allege any other factual matters, the Plaintiffs/Counter Defendants deny the same.

6.  Plaintiffs/Counter Defendants state that the Operating Agreement, speaks for itself. To the extent that paragraph six may be construed to allege any other factual matters, the Plaintiffs/Counter Defendants deny the same.

## COUNT I

7.    Paragraph seven states a legal conclusion to which no response is required.

8.    Plaintiffs/Counter Defendants state that the operating agreement, speaks for itself. To the extent that paragraph eight may be construed to allege any additional factual matters, the Plaintiffs/Counter Defendants deny the same.

9.    Paragraph nine states a legal conclusion to which no response is required.

11.(*sic*)Plaintiffs/Counter Defendants deny the allegations contained in the paragraph 11 of the counterclaim.

12. (*sic*)Plaintiffs/Counter Defendants deny the allegations in paragraph twelve of the counterclaim.

WHEREFORE, Plaintiffs/Counter Defendants pray that this court enter in judgment in their favor, and against the Defendant/Counter plaintiffs, and to strike and dismiss the counterclaim with prejudice, awarding Plaintiffs/Counter Defendants costs in this regard.

## COUNT II

13.    Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves.  To the extent that paragraph thirteen may be construed to allege any additional factual matters, Plaintiffs/Counter Defendants deny the same.

14.    Plaintiffs/Counter Defendants state that their complaint speaks for itself, and to the extent that paragraph fourteen differs from what is stated in the Plaintiffs complaint; Plaintiffs/Counter Defendants deny the same.

15.    Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves.  To the extent that paragraph fifteen may be construed to allege any additional factual matters, Plaintiffs/Counter Defendants deny the same.

16.    Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves.  To the extent that paragraph sixteen may be construed to allege any additional factual matters, Plaintiffs/Counter Defendants deny the same.

17.    Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves.  To the extent that paragraph seventeen

may be construed to allege any additional factual matters, Plaintiffs/Counter Defendants deny the same.

18. Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves. To the extent that paragraph eighteen may be construed to allege any additional factual matters, Plaintiffs/Counter Defendants deny the same.

19. Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves. To the extent that paragraph nineteen may be construed to allege any factual matters, Plaintiffs/Counter Defendants deny the same.

20. Plaintiffs/Counter Defendants states that the documents referred to in this paragraph speak for themselves. To the extent that paragraph twenty may be construed to allege any factual matters, Plaintiffs/Counter Defendants deny the same.

21. Plaintiffs/Counter Defendants lacks efficient knowledge to admit or deny the allegations of paragraph twenty-one, and demand strict proof thereof.

22. Paragraph twenty two states a legal conclusion to which no response is required.

WHEREFORE, Plaintiffs/Counter Defendant John O'Leary pray that this court enter in judgment in their favor, and against the Defendant/Counter plaintiffs, and to strike and dismiss the counterclaim with prejudice, awarding Plaintiffs/Counter Defendants costs in this regard

### COUNT III (vs. John O'Leary only)

23. Paragraph twenty-three states legal conclusion to which no response is required.

24. Plaintiff/Counter Defendant John J. O'Leary denies the allegations contained in paragraph twenty-four count three of the counterclaim.

25. Plaintiff/Counter Defendant John J. O'Leary denies allegations contained in paragraph twenty-five.

26. Plaintiff/Defendant John J. O'Leary denies the allegations contained in paragraph twenty-six including and specifically paragraphs 26 a) through g) in their entirety.

27.    Defendant John J. O'Leary denies allegations contained in paragraphs twenty-seven.


WHEREFORE, Plaintiffs/Counter Defendant John J. O'Leary prays that this court enter in judgment in his favor, and against the Defendant/Counter plaintiffs, and to strike and dismiss the counterclaim with prejudice, awarding Plaintiffs/Counter Defendants costs in this regard

LAW OFFICES OF THOMAS A. MORRISSEY

By:_____

Thomas A. Morrissey


LAW OFFICES OF THOMAS A. MORRISSEY
102 W. Burlington
Suite 4
La Grange, Illinois 60525
(708) 352 2790
Firm I.D. No. 17001

# EXHIBIT 4



Liberty Insurance Underwriters Inc.
55 Water Street, 18th Floor
New York, NY 10041
212-208-4100

LIU 1301 Ed. 11 00

# LIBERTY INSURANCE UNDERWRITERS, INC. (The Liberty Mutual Group)

# ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

## DECLARATIONS

**NOTICE: THIS IS A CLAIMS MADE AND REPORTED POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND OTHERWISE COVERED BY THIS INSURANCE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**POLICY NUMBER:** LPA201972-016     **RENEWAL OF:** 05APIL00305

**PRODUCER AND ADDRESS:** Affinity Insurance Services, Inc.
1411 Opus Place, Suite 250
Downers Grove, IL 60515

**NAMED INSURED AND ADDRESS:** John J. O'Leary
Attorney at Law
120 S State Street
Suite 200
Chicago, IL 60603-5503

The Named Insured is:
   X Individual            Partnership
     Corporation           Limited Liability Partnership
     Limited Liability Corporation       Other

**POLICY PERIOD:** From: 6/10/2006    To: 6/10/2007
(12:01 A.M. at the Named Insured's address set forth above)

**LIMIT OF LIABILITY:** $500,000    Each Claim
                $1,000,000    Aggregate

**DEDUCTIBLE:** $5,000    Each Claim

**PREMIUM:** $2,271.00

## ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:

LIU1300 (01/01)
LIU1303 (11/00)    LIU1310 (11/00)    LIU1317 (11/00)

This Declarations page, together with the Application, the attached Illinois Lawyers Professional Liability Insurance Policy, and all endorsements thereto, shall constitute the contract between Liberty Insurance Underwriters, Inc. and the Named Insured identified above. This policy is valid only if signed below by a duly authorized representative of Liberty Insurance Underwriters, Inc.

_____
Authorized Representative

June 22, 2006
Issue Date



LIU 1303 Ed. 11 00

## THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.

## AGGREGATE DEDUCTIBLE ENDORSEMENT (INCLUDING CLAIM EXPENSES)

This endorsement, which is effective at 12:01AM on   06/10/2006
Forms a part of policy number  LPA201972-016
Issued to   John J. O'Leary
        Attorney at Law

This endorsement modifies insurance provided under the following:

ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium charged, it is hereby agreed and understood that:

1. **"DEDUCTIBLE:** _____ $5,000.00  Each Claim"** set forth in the Declarations is deleted and replaced by:

   **"DEDUCTIBLE:** _____ $5,000.00  Aggregate"**

2. The section entitled **Limits of Liability & Deductible**, sub-section 4. **Deductible.** is deleted in its entirety and replaced with the following:

   "4.  **Deductible.** The deductible amount stated in the Declarations as "aggregate" shall apply to all **claims** first made against **you** and reported to us during the **policy period** and the Automatic Extended Reporting Period. A separate aggregate deductible equal to 100% of the aggregate deductible stated in the Declarations shall apply to all **claims** first made against **you** and reported to us during any Optional Extended Reporting Period, if purchased. The deductible amount stated in the Declarations shall be paid by **you** and shall be applied to all **damages** and **claim expenses**. The deductible must be paid by **you** as a condition precedent to payment of any loss by us. Each person insured is liable for payment of the deductible. Such amount shall be paid by **you** within thirty (30) days of written demand therefor by us regardless of the number of **claims** first made during the **policy period**, the Automatic Extended Reporting Period and the Optional Extended Reporting Period, if purchased. The deductible shall automatically be reduced by fifty percent (50%) for arbitrated or mediated **claims** under specific conditions, and subject to certain limitations, that are described fully in the **Special Benefits** section of this policy."

### All other terms and conditions remain unchanged.



LIU 1310 Ed. 11 00

## THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIED ENTITIES AND/OR INDIVIDUALS EXCLUSION ENDORSEMENT

This endorsement, which is effective at 12:01AM on 06/10/2006
Forms a part of policy number LPA201972-016
Issued to John J. O'Leary
Attorney at Law

This endorsement modifies insurance provided under the following:

ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium charged, it is hereby agreed and understood that:

This policy does not apply to any **claim** alleging, arising out of, based upon, attributable to, or in any way related to any **wrongful act** which arises out of the rendering or failure to render **professional legal services** for the following entities and/or individuals:

1.  METRO CHICAGO REAL ESTATE

2.

3.

4.

5.

6.

7.

8.

9.

10.

## All other terms and conditions remain unchanged.

Page 1 of 1



Liberty
Insurance
Underwriters Inc.

LIU 1017 Ed. 11 00

## THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.

## PRIOR ACTS EXCLUSION ENDORSEMENT

This endorsement, which is effective at 12:01AM on 05/10/2006
Forms a part of policy number
Issued to: Mr. John J. O'Leary
Attorney at Law

This endorsement modifies insurance provided under the following:

ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium charged, it is hereby agreed and understood that no coverage is provided under this policy for any wrongful act that took place prior to:

05/10/1989
Prior Acts Exclusion Date

The named insured understands and agrees to the above.

_____
Signature of Partner, Member, Owner, or Sole Proprietor

_____
Print Name & Title

6/10/06
Date

All other terms and conditions remain unchanged.

LETTERHEAD
REQUIRED

## Lawyers Professional Liability Insurance
## Renewal Application

Name: Law offices of John J. O'Leary
Address: 1252 N. Damen
City: Chicago  State: IL  Zip: 60622

Phone: 773-384-7100
Fax: 773-384-7106
Website:
E-mail: Joleary7@msn.com
Limit Requested: Same as expiring
Deductible Requested: Same as expiring

**1. Personnel** — List all lawyers to be covered (Do not list "of counsel", independent contractors or per diem lawyers)

| NAME | STATUS DESIGNATION CODES * | STATE(S) ADMITTED TO PRACTICE | YEAR FIRST ADMITTED TO BAR |
|------|---------------------------|-------------------------------|----------------------------|
| 1. John J. O'Leary | S | IL | 1990 |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |

* S Sole proprietor    P- Partner/Member    E-Employed lawyer
_____ Hours of service provided to applicant per year by "of counsel", independent contractor/per diem lawyers.
_____ Current total number of non-lawyer employees.
Attach separate sheet if necessary.
** For new attorneys please complete a New Lawyer Form.

**2. Mergers and/or Acquisitions**
Has the applicant merged with, or acquired, another law firm since last year's application?    ☐ Yes ☒ No
If yes, please attach a narrative describing the details.

**3. Area of Practice Changes** – From Expiring Policy    NO CHANGE ☐

| | % |
|---|---|
| Admiralty/Marine | % |
| Anti-Trust Trade Regulation | % |
| Arbitration/Mediation | % |
| Banking | % |
| Bankruptcy | % |
| Bodily Injury/Defense | % |
| Bodily Injury/Plaintiffs | % |
| Collection Repossession | % |
| Copyright/Patent/TM | 15 % |
| Corporate | % |
| Criminal | % |
| Domestic Relations | % |
| Entertainment | % |

| | % |
|---|---|
| Environmental | % |
| ERISA | % |
| Est. Plan/Probate/Trusts/Wills | % |
| Immigration | % |
| International Law | % |
| Investment Counseling | % |
| Labor Relations | % |
| Public Utilities | % |
| Real Estate – Residential | 60 % |
| Real Estate – Commercial | 10 % |
| Real Estate – Synd. Devel. | % |
| Real Estate – Title Work | 15 % |

| | % |
|---|---|
| Real Estate – Condo Offering | % |
| Securities – Federal* | % |
| Securities – State* | % |
| Securities – Private Placement* | % |
| Securities – Bonds* | % |
| Social Security Disability | % |
| Tax Preparation | % |
| Tax Opinions | % |
| Workers Comp/Defense | % |
| Workers Comp./Plaintiff | % |
| OTHER (Describe if over 5%) | % |
| TOTAL (Must equal 100%) | 100 % |

*Please complete Securities Supplemental Application.

LIU 1349 Ed. 12 01



**LIBERTY INSURANCE UNDERWRITERS, INC.**

**4. Claims, Incidents & Disciplinary Actions**
After inquiry, have any of the following occurred during your expiring policy:

A. Disciplinary actions against any lawyer? Ever been disbarred or been the subject of reprimand, censure, reproval, or other disciplinary action, or been refused admission to the Bar?
If "Yes", please explain by attachment. ☒ Yes ☒ No



B. Claims? ☒ Yes ☒ No
C. Incidents or circumstances that could result in a claim? ☒ Yes ☒ No
D. Changes in the status, amounts reserved and/or amounts paid for claims, incidents or circumstances which were open as of the inception date of the expiring policy? ☒ Yes ☒ No

If yes, to B, C or D please complete a Claims Supplemental Application for each instance.

**5. Signature and Agreements**
Please Read carefully and Sign Below where indicated.
The undersigned proprietor, partner, member or officer, acting on behalf of the applicant and all others to be insured, hereby,

(A) declares after diligent inquiry that the above statements and particulars are true and that no material facts have been suppressed or misstated;

(B) acknowledges that it is understood and agreed that (1) the completion of this application does not bind Liberty Insurance Underwriters, Inc. to issue nor the Applicant to purchase the insurance, (2) however, this application will be the basis of the contract if a policy is issued and (3) all written statements and material furnished to Liberty Insurance Underwriters, Inc. in conjunction with this application are hereby incorporated by reference into this application and made part hereof; and

(C) acknowledges that, in the event Liberty Insurance Underwriters, Inc. issues a policy, (1) Liberty Insurance Underwriters, Inc. in providing coverage will have relied upon, as representations, the declarations and statements which are contained in or attached to or incorporated into this policy; and (2) in the event of a claim for which coverage would otherwise be available under this policy, the Applicant will be required to be defended by lawyers appointed by Liberty Insurance Underwriters, Inc. and if the insured elects to handle any claim without such lawyers or otherwise without Liberty Insurance Underwriters, Inc.'s involvement, then no coverage for such claim will be afforded the Applicant under the policy.

**NOTICE:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each violation.

Sign & Date in Ink.
Signed by: _____  Title: Sole Proprietor

Print Name: _____  Date: 67.07

LIU 1349 Ed. 12 01



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

**THIS IS A CLAIMS-MADE POLICY.  PLEASE READ IT CAREFULLY.**

## ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

### Preface

This policy provides professional liability protection for your law firm.  The terms **we, us,** and **our** refer to Liberty Insurance Underwriters, Inc., the company issuing this policy, and the terms **you** and **your** refer to those persons or legal entities insured by this policy.  The **named insured,** an entity incorporated within the terms **you** and **your,** has special duties and responsibilities, which are described in the policy.

Various terms used in this policy have special definitions.  When specially defined terms are used they will be printed in uncapitalized, boldface type **thus.**  A list of the policy's specially defined terms is contained in the **Definitions** section of the policy.  This policy also contains sections and sub-sections that will have titles printed **Thus.**  These titles are provided for informational purposes only and do not have special meanings.  Irrespective of its title, the meaning of each section or sub-section is expressed solely by its contents.

This policy is organized into the following sections:

**Preface**
**Coverage**
**Definitions**
**Special Benefits**
**Territory**
**Exclusions**
**Limits of Liability & Deductible**
**Defense of Claims**
**Claims**
**Extended Reporting Periods**
**Conditions**

There are exclusions and conditions that apply to the coverage provided by this policy.  All persons and entities afforded protection by the policy should read it carefully.  This preface is provided for information only and does not provide or modify coverage.

### Coverage

**We** agree with the **named insured** that in consideration of the premium paid, **your** obligation to pay the deductible, and in reliance upon the statements made by the **named insured** in the application, the Declarations, and supplementary information provided by the **named insured,** and subject to the limits of liability as stated in the Declarations, and the exclusions and all other terms and conditions of this policy, as follows:

**We** agree to pay on **your** behalf all **damages** in excess of the deductible amount and up to the limits of liability stated in the Declarations that **you** become legally obligated to pay, provided such **damages:**

1.  result from **claims**

    a.  first made against **you** during the **policy period** or any extended reporting period, if applicable, and
    b.  reported to **us** in writing; and

2.  are caused by a **wrongful act** which takes place before or during the **policy period** but not before the Retroactive Date set forth in the Declarations, if any.



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

## Definitions

Whenever the specially defined terms below are used in the policy they will be printed in uncapitalized, boldface type **thus**.

1. **bodily injury** means physical injury, sickness, disease or death of any person.

2. **claim** means a demand received by **you** for money or services, including the service of suit or institution of arbitration proceedings against **you**, or a **disciplinary proceeding**.

3. **claim expenses** means:

   a. reasonable and necessary fees charged by any lawyer designated by **us**;
   b. all reasonable and necessary fees and expenses charged by any lawyer selected by **you** as independent counsel, where a conflict of interest exists and applicable law permits **you** to select such independent counsel and requires **us** to pay for such independent counsel;
   c. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim**, if incurred by **us**;
   d. all costs allocated to **you** in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before **we** have paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of **our** liability thereof; and
   e. premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of this policy. **We** shall have no obligation to pay for or furnish any bond.

   However, **claim expenses** does not include salary charges of **our** regular employees or officials. None of **your**

fees, costs or expenses is **claim expenses** except those costs and expenses related strictly to the defense of a **disciplinary proceeding**.

4. **damages** means a monetary judgment or settlement, but does not include fines or statutory penalties, sanctions whether imposed by law or otherwise, any other amount awarded in any **disciplinary proceeding**, the return of or restitution of legal fees, costs and expenses, punitive or exemplary damages, the multiplied portion of multiplied **damages**, amounts for which **you** are not financially liable or which are without legal recourse to **you** or matters which may be deemed uninsurable under applicable law.

5. **disciplinary proceeding** means a proceeding in which a complaint alleging a **wrongful act**, a violation of any disciplinary rule or other professional misconduct is brought before a tribunal of competent jurisdiction which shall make a determination subject to appeal or other review and/or a final and enforceable determination as to whether such alleged professional misconduct is to be the subject of discipline.

6. **named insured** means the person or entity designated in the Declarations and any **predecessor** of such entity.

7. **organization** means a corporation, partnership, association, trust or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature.

8. **personal injury** means

   a. false arrest, humiliation, detention or imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation (criminal or civil), abuse of process, malicious prosecution;
   b. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a

Page 2 of 14



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

publication or utterance in violation of an individual's right of privacy; or

c.  injury arising out of an offense occurring in the course of the **named insured's** advertising activities, including but not limited to infringement of copyright, title slogan, patent, trademark, trade dress, trade names, service mark or service number.

9.  **policy period** means the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

10. **predecessor** means any individual or entity engaged in the practice of law to whose financial assets and liabilities the **named insured** is the majority successor in interest.

11. **professional legal services** means legal services and activities performed for others as:

a.  a lawyer;
b.  a notary public;
c.  an arbitrator;
d.  a mediator;
e.  a title insurance agent;
f.  a designated issuing lawyer to a title insurance company;
g.  a court-appointed fiduciary;
h.  a member of a bar association, ethics, peer review, formal accreditation or licensing, or similar professional board or committee;
i.  an author, strictly in the publication or presentation of research papers or similar materials and only if the fees generated from such work are not greater than ten thousand dollars ($10,000); and/or
j.  an administrator, conservator, receiver, executor, guardian, or any similar fiduciary capacity, or court-appointed trustee, however, no coverage shall apply to any loss sustained by **you** as the beneficiary or distributee of any trust or estate.

Services performed by **you** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be professional services in **your** capacity as a lawyer, although such services could be performed wholly or in part by nonlawyers.

12. **property damage** means injury to or destruction of any tangible property or loss of use therefrom. Tangible property does not include currency and negotiable instruments.

13. **totally and permanently disabled** means that **you** have become so disabled as to be wholly prevented from rendering **professional legal services** provided that such disability:

a.  has existed continuously for not less than 6 months; and
b.  is expected to be continuous and permanent.

However, **totally and permanently disabled** shall not include any condition which:

a.  occurred as a result of war or acts of war, whether or not declared;
b.  occurred during active service in the armed forces of any country; or
c.  results from:
    1.  intentionally self-inflicted injuries;
    2.  attempted suicide, whether or not sane; or
    3.  the abuse or misuse of chemical compounds or alcohol.

14. **we, us, our** and **ours** refer to Liberty Insurance Underwriters, Inc., the company issuing this insurance.

15. **wrongful act** means any actual or alleged act, error, omission or **personal injury** which arises out of the rendering or failure to render **professional legal services.**

16. **you** means:

a.  if the **named insured** is an individual, such individual;

Page 3 of 14



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

b. if the **named insured** is a partnership or limited liability partnership, such partnership or limited liability partnership and each lawyer who is a partner thereof including any incorporated partner and each shareholder of any such incorporated partner;

c. if the **named insured** is a professional corporation, limited liability corporation or professional association, such professional corporation, limited liability corporation or professional association and each lawyer who is a shareholder or member thereof;

d. each lawyer employed by the **named insured;**

e. any person

1. who qualified prior to the **policy period,** but who no longer qualified as of the first day of the **policy period;** or
2. who during the **policy period** qualifies

as an **insured** under b., c., or d., immediately above, but only to the extent such person performs or has performed **professional legal services** on behalf of the **named insured;**

f. each lawyer acting as "of counsel" but only while performing **professional legal services** on behalf of the **named insured;**

g. any lawyer who is acting as an independent contractor or on a per diem basis to the **named insured,** but only as respects **professional legal services** rendered on behalf of the **named insured;**

h. all nonlawyer employees who were, are now or become employees of the **named insured,** but only while acting within the scope of their employment on behalf of the **named insured;**

i. the estate, heirs, executors, administrators, assigns and legal representatives of each of **you** in the event of **your** death, incapacity, insolvency or bankruptcy, but only to the extent

that **you** would otherwise be provided coverage under this policy.

17. **your** means belonging to **you.**

**Special Benefits**

1. **Claim Expenses.**

   a. The first $2,500 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the deductible.

   b. If the "per **claim**" limit of liability stated in the Declarations is less than $500,000, the first $100,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

   c. If the "per **claim**" limit of liability stated in the Declarations is at least $500,000 but is less than $2,000,000, the first $250,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

   d. If the "per **claim**" limit of liability stated in the Declarations is $2,000,000 or more, the first $500,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

2. **Disciplinary Proceeding Defense Cost Reimbursement.** If a **disciplinary proceeding** is brought against **you, we** will reimburse reasonable costs that **you** incur in the defense of such matters, provided **you** do not admit all or any part of the allegation. Any reimbursement made pursuant to this sub-section will be in addition to the limits of liability set forth in the Declarations.

   The most **we** will reimburse for any one **disciplinary proceeding** is $25,000. The most **we** will reimburse during the policy period or any extended reporting period, if applicable, for all **disciplinary proceedings** is $100,000 in the

Page 4 of 14



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

aggregate. **Our** determination as to the reasonableness of fees, costs and expenses will be conclusive on **you**. **We** will waive **your** deductible with respect to reimbursements made under this sub-section.

3. **Loss of Earnings. If we** request in writing that **you** attend a trial, hearing, or arbitration proceeding pursuant to the resolution of a **claim, we** will pay **you** up to $500 per day for **your** loss of earnings for each such day or part thereof you attend. The most we will pay under this sub-section is $10,000 each **claim** and $50,000 in the aggregate for all **claims** made during the **policy period** or extended reporting period, if applicable. Any payment made pursuant to this sub-section will be in addition to the limits of liability set forth in the Declarations.

4. **Reduced Deductible for Arbitrated or Mediated Claims. We** will reduce the deductible amount stated in the Declarations by fifty percent (50%) if **you** agree with a request **we** make, and agree with the terms and conditions **we** specify, to submit a **claim** made against **you** to binding arbitration or mediation. While the right to submit a **claim** to binding arbitration or mediation shall be **ours** solely, no **claim** shall be submitted to arbitration without **your** prior written consent. In the case of mediation, the maximum dollar amount the deductible will be reduced under this special benefit is $2,500.

## Territory

The insurance afforded applies worldwide.

## Exclusions

1. **Known Claims or Circumstances.** This policy does not apply to any **claim** arising out of a **wrongful act** occurring prior to the **policy period** if, prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by **us** to the **named insured** and continuously renewed and

maintained in effect to the inception of this **policy period:**

a. **you** gave notice to any prior insurer of any such **claim** or **wrongful act;**

b. **you** had a reasonable basis to believe that **you** had breached a professional duty, committed a **wrongful act,** violated a disciplinary rule, engaged in professional misconduct or to foresee that a **claim** would be made against **you;** or

c. there is a prior policy or policies which provide insurance for such **wrongful act** or **claim,** unless the available limits of liability of such prior policy or policies are insufficient to pay any liability or **claim,** in which event this policy will be excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

2. **Fraudulent, Criminal, Malicious, Deliberately Wrongful Acts, or Omissions.** This policy does not apply to any judgment or final adjudication based upon, arising out of or in any way related to any dishonest, fraudulent, criminal, malicious or deliberately wrongful acts or omissions committed by **you. We** will defend allegations of the foregoing acts or omissions until the time they are finally adjudicated or admitted by **you.**

This exclusion does not apply to each of **you** who did not personally commit, personally participate in committing, or remain passive after learning about one or more of the acts or omissions described in this exclusion. However, **our** obligation to provide coverage in any such case shall be excess of the deductible and excess of the full extent of any assets in the **named insured,** or monetary value attributed to such assets, of anyone to whom this exclusion applies.

3. **Certain Services and Capacities.** This policy does not apply to any **claim**



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

arising out of **your** services and/or capacity as:

a. an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;
b. a public official, or an employee of a governmental body, subdivision, or agency;
c. a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments thereto, or similar federal, state, local or common law, or any regulation or order issued pursuant thereto, except if **you** are deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan.

4. **Bodily Injury and Property Damage.** This policy does not apply to any **claim** based upon or arising out of **bodily injury** or property damage, unless:

a. the liability for such **claim** is caused by the performance of **professional legal services** by **you**;
b. such **bodily injury** or **property damage** would not have otherwise occurred directly or indirectly but for the performance of **professional legal services** by **you** and no other cause or circumstance contributed to the loss, including but not limited to the negligence of a third party;
c. such **bodily injury** or **property damage** takes place on premises occupied by the **named insured**;
d. such **bodily injury** does not happen to **you** and such **property damage** does not occur to any property owned by **you**;
e. the liability for such **claim** does not arise directly or indirectly out of any obligation under any workers' compensation, disability benefits or unemployment compensation law or any similar law;

f. such **bodily injury** or **property damage** does not arise out of actual, alleged or threatened pollution; and
g. the liability for such **claim** does not arise directly or indirectly out of the use, ownership, and/or maintenance of owned, nonowned, hired, rented, or loaned automobiles, trucks, aircraft or watercraft by **you**.

However, this exclusion does not apply to mental illness or emotional distress or humiliation caused by **personal injury**.

5. **Insured versus Insured.** For the purpose of this sub-section, the term "insured" shall mean "you." This policy does not apply to any **claim** made by one or more insured against another insured unless an attorney/client relationship exists.

6. **Equity Interests.** If a person insured under this policy owns, along with his or her spouse, ten percent (10%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective equity interest of:

a. all persons and entities insured under this policy;
b. spouses of persons insured under this policy; and
c. the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.

Page 6 of 14



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

**Limits of Liability & Deductible**

1. **Claim expenses.** **Claim expenses** reduce this policy's limits of liability and **claim expenses** apply to this policy's deductible. However, subject to specific conditions and limitations, a certain amount of **claim expenses** do not apply to the limits of liability or to the deductible as fully described in the **Special Benefits** section of the policy.

2. **Limits of Liability - Each Claim.** The most **we** will pay for **damages** and **claim expenses** for each **claim** is specified as "each claim" in the limits of liability section of the Declarations and is subject always to the amount specified as "aggregate" in the limits of liability section of the Declarations.

3. **Limits of Liability — Aggregate.** The most **we** will pay for **damages** and **claim expenses** for all **claims** is specified as "aggregate" in the limits of liability section of the Declarations.

4. **Deductible.** The deductible amount stated in the Declarations shall apply to all **damages** and **claim expenses** for each and every **claim**, and must be paid by **you** as a condition precedent to payment of any loss by **us**. Each person insured is liable for payment of the deductible. **You** must pay such deductible amount within thirty (30) days of **our** written request therefor regardless of the number of **claims** made under this policy. The deductible shall automatically be reduced by fifty percent (50%) for arbitrated or mediated **claims** under specific conditions, and subject to certain limitations, that are described fully in the **Special Benefits** section of this policy.

5. **Multiple Policies Issued by Us Covering the Same Claim.** If two or more policies of Lawyers Professional Liability Insurance issued by **us** covering **you** apply to the same **claim** or **claims** for which **you** are jointly and severally liable, **we** shall not be liable under this policy for a greater proportion of such **damages** than **our** liability under this policy bears to **our** total liability under all applicable valid and collectible insurance issued by **us**, provided

that **we** shall not pay on **your** behalf any sum that exceeds the limit of liability of that policy issued by **us** that has the highest applicable limits of liability. In such circumstances, **you** will not be responsible under this policy for a greater proportion of the deductible than **your** responsibility under this policy bears to **your** total responsibility for all applicable deductibles, provided that **you** will not be responsible for any amount that exceeds the deductible of that policy issued by **us** that has the highest applicable deductible.

6. **Multiple Insureds, Claims and Claimants.** Neither the making of a **claim** against more than one of **you** nor the making of **claims** by more than one person or entity shall operate to increase **our** limits of liability. **Claims** alleging, based upon, arising out of or attributable to the same or related **wrongful acts** shall be treated as a single **claim** regardless of whether made against one or more than one of **you**. All such **claims**, whenever made, shall be considered first made during the **policy period** or any extended reporting period in which the earliest **claim** arising out of such **wrongful acts** was first made, and all such **claims** shall be subject to the same limits of liability.

**Defense of Claims**

**We** have the right and duty to defend any **claim** against **you** including the appeal thereof seeking **damages** to which this insurance applies even if any of the allegations of the suit are groundless, false, or fraudulent. This policy contains a provision whereby **we** will reimburse **you** for certain costs **you** incur as a result of defending a **disciplinary proceeding** against **you**, however, **we** have no duty to defend **you** in a **disciplinary proceeding**. This provision is described fully in the **Special Benefits** section of this policy.

**We** have the right to make any investigation **we** deem necessary and, with **your** written consent, any settlement of any **claim** covered by the terms of this policy. If **you** refuse to consent to any settlement or compromise recommended by **us** and acceptable to the claimant and elect to contest the **claim**, then **our** liability under this

Page 7 of 14

**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

policy shall be limited to the amount for which **we** would have been liable for **damages** and **claim expenses** if the **claim** had been so settled or compromised, when and as so recommended. **We** shall have no liability for **claim expenses** incurred thereafter and shall have the right to withdraw from the further investigation and/or defense thereof by tendering control of such investigation or defense to **you**, and **you** agree, as a condition of the issuance of this policy, to accept such tender.

## Claims

1.  **Notice of Claims.** **You** must give **us** written notice of any **claim(s)** or potential **claim(s)** made against **you** as soon as practicable but not later than sixty (60) days after expiration of the **policy period** or an extended reporting period, if applicable. In the event suit is brought against **you**, **you** must immediately forward to **us** every demand, notice, summons, complaint or other process received directly or by **your** representatives. Written notice of any claim against **you**, as well as of each demand on or action against **us**, must be delivered to **us** addressed as follows:

    > Liberty Insurance Underwriters, Inc.
    > 61 Broadway, 32nd Floor
    > New York, NY  10006
    > Attention: Claims Division

    All notices to **us** must be in writing. Notice given by or on behalf of **you**, or written notice by or on behalf of any claimant, to **our** agent shall be considered notice to **us**.

    Whenever coverage under this policy would be excluded, suspended or lost because of noncompliance with this sub-section entitled **Notice of Claims**, **we** agree to waive this exclusion, suspension or loss of coverage with respect to each of **you** who did not personally fail to comply with, personally participate in failing to comply with, or remain passive after learning about noncompliance with the requirements of this sub-section.

2.  **Discovery Clause.** Should **you** first become aware during the **policy period** or any extended reporting period, if applicable, of a **wrongful act** for which coverage is

otherwise provided hereunder, and should **you** during the **policy period** or any extended reporting period, if applicable, give written notice to **us** of:

a.  the specific **wrongful act**;
b.  the injury or **damage** which has resulted or may result from such **wrongful act**; and
c.  the circumstances by which **you** first became aware of such **wrongful act**,

then any **claim** that may subsequently be made against **you** arising out of such **wrongful act** shall be deemed for the purposes of this insurance to have been made during the **policy period** or any extended reporting period, if applicable.

3.  **Assistance and Cooperation.** **You** must cooperate with **us** and upon **our** request **you** must submit to examination and interrogation by **our** representative, under oath if required, and must attend hearings, depositions and trials, and must assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to **our** representatives, including investigating and coverage counsel, and meeting with such representatives for the purpose of investigation, including the investigation of coverage issues and/or defense, all without charge to **us**. **You** must further cooperate with **us** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that **you** may have. **You** must not, except at **your** own cost, make any payment, admit any liability, settle any **claims**, assume any obligation or incur any expense without **our** prior written consent.

4.  **False or Fraudulent Claims.** If **you** commit fraud in proffering any **claim** under this policy as regards amount or otherwise, the insurance provided under this policy shall become void as to **you** from the date such fraudulent **claim** is proffered.

Comment:



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

**Extended Reporting Periods**

1. **Automatic Extended Reporting Period.**
   If the **named insured** or **we** cancel or refuse to renew this policy, then the insurance afforded by this policy shall be automatically extended, subject otherwise to its terms, limits of liability, exclusions and conditions, to apply to **claims** first made against **you** during the sixty (60) days immediately following the effective date of such nonrenewal or cancellation, but only by reason of a **wrongful act** occurring before such effective date and otherwise covered by this insurance. Such period shall hereinafter be referred to as the "Automatic Extended Reporting Period."

   2. **Optional Extended Reporting Period.** If the **named insured** or **we** cancel or refuse to renew this policy, then the **named insured**, upon payment of an additional premium as set forth below, shall have the option to extend the insurance afforded by this policy for a specific time period, subject otherwise to its terms, limits of liability, exclusions and conditions, to apply to **claims** first made against **you** immediately following the effective date of such nonrenewal or cancellation. However, this extension of coverage shall only apply to **wrongful acts** occurring before such effective date and otherwise covered by this insurance.

   A specific extension period must be selected by the **named insured**. Extension period options are listed below with an additional premium set forth opposite each option. The additional premiums stated are a percentage of the full annual premium of this policy, less any return premium owed because of cancellation, plus any premium owed **us** for this policy.

| Option | Additional Premium |
|--------|--------------------|
| 1 year | 100% |
| 2 years | 135% |
| 3 years | 150% |
| 5 years | 185% |
| Unlimited | 225% |

The extension of coverage described in this sub-section entitled **Optional Extended Reporting Period** shall be endorsed hereto, if purchased, and shall hereinafter be referred to as the "Optional Extended Reporting Period."

At the commencement of the Optional Extended Reporting Period, the entire premium therefor shall be deemed earned. The Optional Extended Reporting Period shall not be cancelable.

For purposes of determining the length of the Optional Extended Reporting Period, the Automatic Extended Reporting Period shall be included.

3. **Electing the Optional Extended Reporting Period.** The **named insured's** right to elect the Optional Extended Reporting Period must be exercised by notice in writing not later than sixty (60) days after the effective date of the nonrenewal or cancellation of this policy. Such notice by the **named insured** must indicate the total extension period desired and must include payment of premium for such extension period.

If such notice is not timely given to **us**, the **named insured** shall not at a later date be able to exercise such right. In the event **you** become aware of any **claim** against **you** during the **policy period** but do not report such **claim** to **us** until the Optional Extended Reporting Period, if purchased, such **claim** shall be deemed to have been made and reported during the **policy period**.



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

4.  **Optional Extended Reporting Period Limits of Liability.** If **we** offer to renew this policy and the **named insured** refuses to accept such renewal offer, then **our** limit of liability for **claims** reported during the Optional Extended Reporting Period shall be reinstated to the limit of liability set forth in the Declarations. Otherwise, the following provisions will apply:

    a.  **Insured Three or More Years.** If, upon the effective date of such cancellation or nonrenewal, **we** have provided this insurance to the **named insured** on a claims made basis continually for three or more years, the aggregate limit of liability for the Optional Extended Reporting Period shall be equal to 100% of the aggregate limit of liability stated in the Declarations.

    b.  **Insured Less Than Three Years.** If, upon the effective date of such cancellation or nonrenewal, **we** have provided this insurance to the **named insured** on a claims made basis continually for less than three years, the aggregate limit of liability for the Optional Extended Reporting Period shall be equal to the greater of the amount of coverage remaining in such policy's aggregate limit or 50% of the aggregate limit of liability stated in the Declarations.

    If other insurance exists which covers **claims** first made during the Automatic Extended Reporting Period or the Optional Extended Reporting Period, the coverage provided under this policy for any Automatic Extended Reporting Period or Optional Extended Reporting Period shall apply in excess of such insurance.

7.  **Nonpracticing Extended Reporting Period.** The provisions of this sub-section entitled **Nonpracticing Extended Reporting Period** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

    If **you** retire or otherwise cease the private practice of law during the **policy period**, then **you** have the option to extend the insurance afforded by this policy subject otherwise to its terms, limits of liability, exclusions and conditions, to apply to **claims** first made against you immediately following the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner, but only by reason of a **wrongful act** committed by **you** before **your** date of retirement or termination of private practice and otherwise covered by the insurance, provided there is no other insurance in effect on or after **your** date of retirement or termination of practice which covers **you** for such liability or **claim**. If there is other insurance in effect on or after **your** date of retirement or termination of practice which covers **you** for such liability or **claim**, this coverage shall be excess of the limits of liability of such other insurance.

    The extension of coverage described in this sub-section entitled **Nonpracticing Extended Reporting Period** shall be endorsed hereto, if purchased, and shall hereinafter be referred to as the "Nonpracticing Extended Reporting Period."

    A specific Nonpracticing Extended Reporting Period period must be selected by **you**. Options are listed below with an additional premium set forth opposite each option. The additional premiums stated are a percentage of the full annual premium of this policy per insured lawyer.



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

| Option | Additional Premium |
|--------|--------------------|
| 1 year | 100% |
| 2 years | 135% |
| 3 years | 150% |
| 5 years | 185% |
| Unlimited | 225% |

**We** will waive the premium for the Nonpracticing Extended Reporting Period if **you:**

a. die, except by suicide;
b. become **totally and permanently disabled;** or
c. retire or otherwise cease the private practice of law during the **policy period** and have been insured by **us** under a Lawyers Professional Liability Policy continuously for the last three, full years.

The deductible amount and deductible provisions of this policy will be waived with respect to **claims** first made against **you** during the Nonpracticing Extended Reporting Period, if elected by **you.**

8. **Electing the Nonpracticing Extended Reporting Period**. The provisions of this sub-section entitled **Electing the Nonpracticing Extended Reporting Period** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

**Your** right to elect the Nonpracticing Reporting Period must be exercised by notice in writing not later than sixty (60) days after the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner, or thirty (30) days from the date of mailing or delivery of such notice, whichever is later. Such notice must indicate the total extension period desired and must include payment of premium, if any, for such Nonpracticing Extended Reporting Period.

If such notice is not timely given to **us, you** will not at a later date be able to exercise such right.

9. **Nonpracticing Extended Reporting Period Limits of Liability.** The provisions of this sub-section entitled **Nonpracticing Extended Reporting Period Limits of Liability** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

The limits of liability stated in the Declarations shall be reinstated for **claims** first made against **you** during the Nonpracticing Extended Reporting Period, if elected by **you,** however, regardless of the number of Nonpracticing Extended Reporting Periods purchased, **our** liability shall not exceed the limits of liability set forth in the Declarations.

If the "each **claim**" and "aggregate" limits of liability stated in the Declarations are equal to or less than $250,000 and $750,000, respectively, then the "each **claim**" and "aggregate" limits of liability for **claims** first made and reported during each successive twelve-month period of the Nonpracticing Extended Reporting Period, if applicable, shall increase ten percent (10%) over the applicable "each **claim**" and "aggregate" limits of liability of the preceding twelve-month period, but in no case shall these limits of liability increase after the fourth twelve-month period, if applicable, nor shall the "aggregate" limit of liability be reinstated during each successive twelve-month period by virtue of this provision.

If other insurance exists which covers **claims** first made during the Nonpracticing Extended Reporting Period, the coverage provided under this policy for the Nonpracticing Extended Reporting Period shall apply in excess of such insurance.



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

## Conditions

1. **Firm Changes.** The **named insured** must report to **us** changes during the **policy period** which affect fifty percent (50%) or more of the lawyers insured at the inception of this policy. This notice must be provided within sixty (60) days of the change. The **named insured** does not have to report such changes to **us** if less than six (6) lawyers were insured at the inception of this policy. In the event of a merger, dissolution or acquisition, the **named insured** must use best efforts to notify **us** at least 30 days prior to the projected date of such change, but in no case shall the **named insured** provide **us** with less than five (5) days notice. In each case, **we** will have the right to accept, alter or decline coverage and to charge an additional premium.

2. **Subrogation.** In the event of any payment under this policy, **we** shall be subrogated to all **your** rights of recovery therefor against any person or entity, provided, however, **we** shall not exercise any rights of subrogation against any of **you** who did not commit the wrongdoing. **You** must execute and deliver instruments and papers and do whatever else is necessary to secure such rights and **you** must do nothing to prejudice such rights.

   Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to **damages** and/or **claim expenses** paid by **you** in excess of the limits of liability; third, to **damages** and/or **claim expenses** paid by **us**; fourth, to **damages** and/or **claim expenses** paid by **you** in excess of the deductible; and last, to repayment of the deductible.

3. **Action Against Us.** No action shall lie against **us** unless, as a condition precedent thereto, **you** shall have fully complied with all the terms of this policy, nor until the amount of **our** obligation to pay shall have been fully and finally determined either by judgment against **you** either after judgment against **you** or by written agreement of **you**, the claimant and **us**. In the event any

person or entity or the legal representative thereof has secured a judgment against **you** and such judgment remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon **your** attorney, or upon **you**, and upon **us**, then an action may, except during a stay or limited stay of execution against **you** on such judgment, be maintained against **us** under this policy for the amount of such judgment to the extent of the insurance afforded by this policy.

Nothing contained in this policy shall give any person or entity the right to join **us** as a co-defendant in any action against **you** to determine **your** liability. Bankruptcy or insolvency of **you** or of **your** estate shall not relieve **us** of any of **our** obligations hereunder.

4. **Application.** By acceptance of this policy, **you** agree that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon such representations and that this policy embodies all agreements existing between **you** and **us**, or any of **our** agents, relating to this insurance.

5. **Other Insurance.** Subject to the limitation of coverage contained in Exclusion 1.c. in the **Exclusions** section of the policy for prior insurance, this insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid insurance available to **you** which insurance is either collectible or uncollectible only because the limits of liability thereof shall have been exhausted, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

6. **Changes.** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **us** shall not effect a waiver or a change in any part of this policy or estop **us** from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed,

**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

except by written endorsement issued to form a part of this policy.

7. **Assignment.**  Assignment of interest under this policy shall not bind **us** unless **our** consent is endorsed in writing hereon.

8. **Cancellation and Renewal.**  The following cancellation and renewal procedures apply to this policy:

**Cancellation**

a. This policy may be cancelled by the **named insured** by surrender thereof to **us** or by mailing to **us** written notice stating when thereafter such cancellation shall be effective.

b. **Cancellation During First Sixty (60) Days.**  If this policy has been in effect for sixty (60) days or less, **we** may cancel this policy by mailing to the **named insured** written notice of cancellation at least:

   i. ten (10) days prior to the effective date of cancellation if **we** cancel for nonpayment of premium; or
   ii. thirty (30) days prior to the effective date of cancellation if **we** cancel for any other reasons.

c. **Cancellation After Sixty (60) Days.**  If this policy has been in effect for more than sixty (60) days, this policy may not be cancelled by **us** except for one or more of the following reasons:

   i. nonpayment of premium;
   ii. the policy was obtained through a material misrepresentation;
   iii. any person insured violated any of the terms and conditions of the policy;
   iv. the risk originally accepted has measurably increased;
   v. certification to the Director of **our** loss of reinsurance for all or a substantial part of the underlying risk insured; or

   vi. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

d. If **we** cancel the policy because **you** have failed to pay a premium when due, this policy may be canceled by **us** by mailing written notice of cancellation to **you** at least ten (10) days prior to the effective date of cancellation.

e. If **we** cancel this policy for any reason specified in Provision c. (i)-(vi) above, this policy may be canceled by **us** by mailing written notice to the **insured** at least sixty (60) days prior to the effective date of cancellation.

f. All notices of cancellation by **us** shall be mailed to the **named insured** at the last mailing address known by **us** and shall state the reason(s) for the cancellation. A copy of all such notices shall be sent to the **your** broker, if known. **We** shall maintain proof of mailing of such notice on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender of the effective date and hour of cancellation stated in the notice shall become the end of the **policy period**.

g. The **named insured** is authorized to act on behalf of all of **you** with respect to the giving and receiving of notice of cancellation and to the receiving of any return premium that may become payable under this policy.

h. If the **named insured** cancels, earned premium shall be computed in accordance with the short rate table and procedure in use for this policy.  If **we** cancel, earned premium shall be computed pro

**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**Nonrenewal**

a. If **we** decide not to renew this policy, **we** shall mail written notice to the **named insured** and the mortgagee or lien holder at least sixty (60) days advance notice of **our** intention not to renew. The notice shall state the reason(s) for the nonrenewal. A copy of all such notices shall be sent to **your** broker, if known.

b. In the event such notice is provided at least thirty-one (31) days but less than sixty (60) days prior to the expiration of the policy, **we** will extend the policy for sixty (60) days or until the effective date of any similar insurance procured by the **named insured**, whichever is less, on the same terms and conditions as the policy sought to be terminated.

c. In the event such notice is provided less than thirty-one (31) days prior to the expiration of the policy, the policy shall be extended for a period of one (1) year or until the effective date of any similar insurance procured by the **named insured**, which ever is less, on the same terns and conditions as the policy sought to be terminated.

d. The premium for extensions of coverage as described above shall be prorated in accordance with the amount of last year's premium. **We** shall be entitled to this premium for the extension of coverage and such extension may be contingent upon the payment of such premium.

9. **Liberalization Clause.** If **we** adopt any revision that would broaden the coverage under the policy without additional premium at any time during the **policy period**, the broadened coverage will immediately apply to this policy.

IN WITNESS WHEREOF, **we** have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations by **our** duly authorized representative.

President

Authorized Representative of
Liberty Mutual Insurance Company

Page 14 of 14

# EXHIBIT 5

### John J. O'Leary
### Law Offices of John J. O'Leary

1252 North Damen Avenue
Chicago, IL 60622
Phone: 773 384 7100
Fax: 773 384 7126
Joleary7@msn.com

To William Durkin

Lamb Little Insurance Company

Dear Mr. Durkin,

Enclosed please find a copy of a counter claim that was filed in a legal matter that I am involved with. The case involves a former client of mine who defaulted on a mortgage and note made to my father, my wife and I. Given the allegations in the counter claim, my attorney informed me on Friday, June 11, 2007 that I may have a professional liability issue. Therefore, I am submitting this information to you. Please amend my recent application for renewal of my policy to include this information. Thank you. I am not making a claim at this time, just informing you of the situation.

I am happy to discuss this with you at anytime.

John J. O'Leary

# EXHIBIT 6

# MECKLER BULGER & TILSON LLP

123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606

Tel: 312-474-7900 • Fax: 312-474-7898
www.mbtlaw.com

Christopher E. Kentra
312-474-7962
chris.kentra@mbtlaw.com

September 11, 2007

**VIA E-MAIL**

John J. O'Leary
Attorney at Law
120 State Street, Suite 200
Chicago, IL 60603-5503

Re:    **Liberty Insurance Underwriters, Inc.**
        **Lawyers Professional Liability Insurance**
        **Insured:**      **John J. O'Leary, Attorney at Law**
        **Claimants:**    **John & Marlene Mulhern**
        **Policy No.:**   **LPA201972-017**
        **Policy Period:** **June 10, 2007 to June 10, 2008**
        **Policy Limits:** **$500,000 Each Claim/$1,000,000 Aggregate**
        **Deductible:**  **$5,000 Each Claim**
        **Our File No.:** **NYSPC000101601**

Dear John:

    We are writing to again acknowledge receipt of a copy of the suit that has been filed against you by John & Marlene Mulhern ("the Claimants"). Consistent with our prior discussion, this letter sets forth LIU's coverage position regarding the captioned claim and requests that you acknowledge the withdrawal of this claim in writing.

    As I understand it, you have advised that you did not intend to submit the Mulhern claim for coverage, but rather simply wanted Liberty to be apprised of its existence. If you agree to withdraw any tender of coverage for this claim, please be advised that you will be precluded from re-submitting this claim for coverage in the future, as well as being precluded from seeking coverage for future claims which may be brought by John & Marlene Mulhern based upon the current allegations that have been stated in this matter.

**The Claim**

    LIU is in receipt of Answer to Complaint for Breach of Contract, Affirmative Defenses and Counterclaim captioned *John J. O'Leary, Renee O'Leary, and Jack O'Leary v. John Mulhern and Marlene Mulhern; John Mulhern and Marlene Mulhern v. John J. O'Leary, Renee O'Leary*



# MECKLER BULGER & TILSON LLP

John J. O'Leary
September 11, 2007
Page 2

*and Jack O'Leary*, which is currently pending in the Circuit Court of Cook County, Municipal Department, Fourth District, Case No. 07 M4 206. The referenced pleading contains a counterclaim which contains three counts: (1) Breach of the Operating Agreement; (2) Declaratory Judgment; and (3) Breach of Fiduciary Duty ("the Counterclaim").

As we understand it, you and other family members entered into a partnership agreement with the Claimants in which you provided an $80,000 loan to the Claimants for them to purchase property located at 341 E. Chicago, Hinsdale, Illinois ("the subject property"). The participants to this investment entered into a limited liability company agreement whereby the Claimants were to sell the subject property after building a home there, and were to provide you and others with a share of the profits of the sale. However, to date, the Claimants still own the property and have not built a home. Apparently, you have been forced to sue the Claimants for breach of contract. In response, the Claimants filed the Counterclaim which was previously provided to Liberty and speaks for itself.

## The Policy

LIU has issued a Lawyers Professional Liability Insurance Policy, number LPA201972-017 (the "Policy"), on a claims-made basis, to you and your firm (hereinafter "the Insured") for the policy period of June 10, 2007 to June 10, 2008 (the "Policy Period"). The Policy provides a limit of liability of $500,000 each claim and $1,000,000 in the aggregate, inclusive of claim expense, subject to a $5,000 per claim deductible, applicable to loss and claim expenses. The extent and applicability of the deductible to claim expenses as well as the erosion of policy limits by claim expenses is set forth in LIU Form 1300 (ed. 01/01) as follows:

Special Benefits

1.    Claim Expenses.

   a.    The first $2,500 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the deductible.

\*          \*          \*

## MECKLER BULGER & TILSON LLP

John J. O'Leary
September 11, 2007
Page 3

     c.     If the "per **claim**" limit of liability stated in the Declarations is at least $500,000 but is less than $2,000,000, the first $250,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

### Coverage Issues

Although you are not seeking coverage under the Policy, it is appropriate to bring the following coverage issues to your attention.

First, Exclusion 3. of the Policy, provides as follows:

1.     <u>**Certain Services and Capacities.**</u>  This policy does not apply to any **claim** arising out of **your** services and/or capacity as:

     a.     an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;

     b.     a public official, or an employee of a governmental body, subdivision, or agency;

     c.     a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments thereto, or similar federal, state, local or common law, or any regulation or order issued pursuant thereto, except if **you** are deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan.

Based on the allegations of the Complaint, it is LIU's position that no coverage is afforded under the Policy for this claim.

Additionally, Exclusion 6. of the Policy, provides as follows:

# MECKLER BULGER & TILSON LLP

John J. O'Leary
September 11, 2007
Page 4

6. **Equity Interests.** If a person insured under this policy owns, along with his or her spouse, ten percent (10%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective equity interest of:

    a.    all persons and entities insured under this policy;

    b.    spouses of persons insured under this policy; and

    c.    the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.

Based on the allegations of the Complaint, LIU again believes that this exclusion precludes coverage under the policy for this matter.

## Withdrawal Of Claim

As we discussed, you have indicated that you are not tendering this matter for coverage to LIU. In light of that fact, we ask that you acknowledge that you will be precluded from re-submitting this claim for coverage in the future, as well as being precluded from seeking coverage for future claims that may be brought by John and Marlene Mulhern based upon the same facts and circumstances. If the foregoing accurately reflects the present circumstances in this matter, please sign and return this document to my attention.

# MECKLER BULGER & TILSON LLP

John J. O'Leary
September 11, 2007
Page 5

Although LIU is not providing coverage for this claim, LIU continues to reserve all other rights and defenses available under the policy and to deny coverage on any of the foregoing bases, or to deny coverage on additional and/or alternative grounds as other terms, conditions, provisions, exclusions and endorsements, as well as any statements, representations or warranties in connection with the Policy application, are found to apply. LIU's position as to coverage for this matter is based on the presently known facts. LIU also reserves the right to supplement its coverage position based upon any facts not presently in LIU's possession.

As always, please do not hesitate to contact me with any questions you may have regarding this matter.

Very truly yours,

Christopher E. Kentra

CEK:jit

cc:    Lamb, Little & Co.
          Attn: Bill Durkin (via facsimile)

On behalf of the Insured, I am withdrawing the captioned claim from consideration for coverage under the subject policy.

_____          _____
John J. O'Leary, Esq.                                          Date

# EXHIBIT 7

# MECKLER BULGER & TILSON LLP

123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606

Tel: 312-474-7900 • Fax: 312-474-7898
www.mbtlaw.com

Christopher E. Kentra
312-474-7962
chris.kentra@mbtlaw.com

November 12, 2007

**VIA FACSIMILE**

Thomas A. Morrissey, Esq.
Law Offices of Thomas A. Morrissey, Esq.
102 W. Burlington Ave. #!A
La Grange, IL 60525

|  |  |
|---|---|
| Re: | **Liberty Insurance Underwriters, Inc.** |
|  | **Lawyers Professional Liability Insurance** |
| **Insured:** | **John J. O'Leary, Attorney at Law** |
| **Claimants:** | **John & Marlene Mulhern** |
| **Policy No.:** | **LPA201972-017** |
| **Policy Period:** | **June 10, 2007 to June 10, 2008** |
| **Policy Limits:** | **$500,000 Each Claim/$1,000,000 Aggregate** |
| **Deductible:** | **$5,000 Each Claim** |
| **Our File No.:** | **NYSPC000101601** |

Dear Tom:

On or about June 13, 2007, Mr. O'Leary notified Liberty Insurance Underwriters, Inc. ("LIU") through a letter to Lamb Little Insurance Co. of a counterclaim filed against him by John & Marlene Mulhern ("the Claimants"). In that letter, he indicated that he did not intend to submit the Mulhern claim for coverage, but rather simply wanted LIU to be apprised of its existence.

At various times after that date, we spoke with both Mr. O'Leary's insurance broker and you as his counsel about Liberty's request that he acknowledge in writing that he was not seeking coverage for the Mulhern claim. We also notified you that it was Liberty's position that no coverage existed for this claim in any event.

On September 11, 2007, we acknowledged receipt of Mr. O'Leary's letter on behalf of LIU and requested written confirmation and acknowledgement that he did not intend to tender the Mulhern counterclaim for coverage under his professional liability insurance policy with LIU. We received no response.



## MECKLER BULGER & TILSON LLP

Thomas A. Morrissey, Esq.
November 12, 2007
Page 2

    In subsequent calls, you and I discussed Liberty's position that no coverage exists and your request that it at least provide a defense to Mr. O'Leary for Mr. Mulhern's counterclaim. Most recently, I provided you with a copy of Mr. O'Leary's policy and asked whether or not he indeed would withdraw the claim. We thereafter agreed that it would be best for Liberty to provide written denial of the claim so that you and Mr. O'Leary could take a final position on the issue of coverage. As I have advised, if necessary, Liberty will file an action seeking a declaration of no coverage with respect to this claim.

### The Claim

    As we understand it, Mr. O'Leary filed a lawsuit captioned *John J. O'Leary, Renee O'Leary, and Jack O'Leary v. John Mulhern and Marlene Mulhern*, which is currently pending in the Circuit Court of Cook County, Municipal Department, Fourth District, Case No. 07 M4 206. In response, the Claimants filed an Answer, Affirmative Defenses and a three count Counterclaim alleging: (1) Breach of the Operating Agreement; (2) Declaratory Judgment; and (3) Breach of Fiduciary Duty ("the Counterclaim").

    Based upon the pleadings filed in the above referenced lawsuit, as we understand it, Mr. O'Leary and other family members entered into a partnership or "joint venture" agreement with the Claimants pursuant to which he provided an $80,000 "investment" into this joint venture, the object of which was to enable the Claimants to purchase a property located at 341 E. Chicago, Hinsdale, Illinois. Claimants executed a promissory note and a mortgage for the subject property for the Claimants' benefit.

    Mr. O'Leary and the other participants to this joint venture executed an operating agreement pursuant to which the Claimants were to sell the subject property after building a home there, and were to provide John, his wife and his father a 50% share of the profits of the sale. However, to date, the Claimants still own the property having failed to put the property in the name of a limited liability company as was agreed. To date, Claimants have not built a home and have instead put the lot on the market for sale.

    Mr. O'Leary sued the Claimants for breach of contract, and John Mulhern individually for fraud. You also seek dissolution of the joint venture.

## MECKLER BULGER & TILSON LLP

Thomas A. Morrissey, Esq.
November 12, 2007
Page 3

In response, the Claimants filed the Counterclaim alleging that Mr. O'Leary, his wife and father breached the operating agreement for allegedly failing to "cooperate" with Mr. Mulhern, refusing to discuss the prospect of making of additional capital contributions. The Claimants also allege that the $80,000 at issue was a capital investment into the joint venture pursuant to the terms of the operating agreement, and not a loan as characterized in the promissory note. Claimants seek a declaration that the operating agreement controls and that accordingly the $80,000 is an investment and that Mr. O'Leary is required to contribute additional capital per the terms of the operating agreement. Finally, Claimants allege that Mr. O'Leary breached a fiduciary duty to them by *inter alia* simultaneously (and in a conflict of interest) acting as: (1) Claimants' attorney in the purchase of the subject property; (2) as a joint venturer with Claimants; and (3) as a lender to Claimants.

### The Policy

LIU has issued a Lawyers Professional Liability Insurance Policy, number LPA201972-017 (the "Policy"), on a claims-made basis, to Mr. O'Leary and his firm (hereinafter "the Insured") for the policy period of June 10, 2007 to June 10, 2008 (the "Policy Period"). The Policy provides a limit of liability of $500,000 each claim and $1,000,000 in the aggregate, inclusive of claim expense, subject to a $5,000 per claim deductible, applicable to loss and claim expenses. The extent and applicability of the deductible to claim expenses as well as the erosion of policy limits by claim expenses is set forth in LIU Form 1300 (ed. 01/01) as follows:

Special Benefits

1.      Claim Expenses.

      a.      The first $2,500 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the deductible.

*          *          *

      c.      If the "per **claim**" limit of liability stated in the Declarations is at least $500,000 but is less than $2,000,000, the first $250,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

# MECKLER BULGER & TILSON LLP

Thomas A. Morrissey, Esq.
November 12, 2007
Page 4

## Coverage Issues

To the extent that Mr. O'Leary is seeking coverage under the Policy, it is appropriate to bring the following coverage issues to your attention.

First, Exclusion 3. of the Policy, provides as follows:

1.     **Certain Services and Capacities.**  This policy does not apply to any **claim** arising out of **your** services and/or capacity as:

    a.     an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;

    b.     a public official, or an employee of a governmental body, subdivision, or agency;

    c.     a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments thereto, or similar federal, state, local or common law, or any regulation or order issued pursuant thereto, except if **you** are deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan.

Based on the allegations of the Complaint, it is clear that Mr. O'Leary was a partner in the joint venture and accordingly no coverage is afforded under the Policy for this claim.

Additionally, Exclusion 6. of the Policy, provides as follows:

6.     **Equity Interests.**  If a person insured under this policy owns, along with his or her spouse, ten percent (10%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective equity interest of:

# MECKLER BULGER & TILSON LLP

Thomas A. Morrissey, Esq.
November 12, 2007
Page 5

      a.      all persons and entities insured under this policy;

      b.      spouses of persons insured under this policy; and

      c.      the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.

Based on the allegations of the Complaint and the face of the operating agreement, again it is clear that this exclusion precludes coverage under the Policy for this matter.

## Denial of Coverage/Withdrawal Of Claim

Based upon the foregoing, Liberty denies any obligation to fund a defense to the counterclaims at issue or to provide coverage. If necessary, Liberty will file a declaratory judgment action against Mr. O'Leary consistent with the analysis set forth in this letter to obtain ruling that no coverage is available under the Policy.

As we previously discussed, Mr. O'Leary originally indicated that he did not intend to tender this matter for coverage to LIU. In light of that fact, and in order to avoid having to file suit against Mr. O'Leary, we again ask that he acknowledge that there is no coverage available for the Mulhern counterclaims. If he does so, he will be precluded from re-submitting this claim for coverage in the future, as well as being precluded from seeking coverage for future claims that may be brought by John and Marlene Mulhern based upon the same facts and circumstances. However, he will forego the expenses associated with a declaratory judgment action by Liberty.

If the foregoing accurately reflects the present circumstances in this matter, please have Mr. O'Leary sign and return this document to my attention withdrawing any request for coverage for this claim. Again, should you fail to provide the same within thirty (30) days of this letter, LIU will have no choice but to file a declaratory judgment action against you.

# MECKLER BULGER & TILSON LLP

Thomas A. Morrissey, Esq.
November 12, 2007
Page 6

Although LIU is not providing coverage for this claim, LIU continues to reserve all other rights and defenses available under the policy and to deny coverage on any of the foregoing bases, or to deny coverage on additional and/or alternative grounds as other terms, conditions, provisions, exclusions and endorsements, as well as any statements, representations or warranties in connection with the Policy application, are found to apply. LIU's position as to coverage for this matter is based on the presently known facts. LIU also reserves the right to supplement its coverage position based upon any facts not presently in LIU's possession.

As always, please do not hesitate to contact me with any questions you may have regarding this matter.

Very truly yours,

Christopher E. Kentra

CEK:jit

On behalf of the Insured, I am withdrawing the captioned claim from consideration for coverage under the subject policy.

_____        _____
John J. O'Leary, Esq.                                    Date